Heinz **PULVERMANN**, Appellant,

v.

The **A. S. ABELL CO.**, Appellee.

Lawrence **WESTBROOK**, Appellant,

v.

The **A. S. ABELL CO.**, Appellee.

**Nos. 7031, 7032.**

United States Court of Appeals
Fourth Circuit.

Argued Nov. 9, 1955.

Decided Jan. 4, 1956.

798

Warren E. Magee, Washington, D. C., and Hal C. B. Clagett, Upper Marlboro, Md. (Magee & Bulow, Washington, D. C., on brief), for appellants.

J. Crossan Cooper, Jr., Baltimore, Md. (Francis D. Murnaghan, Jr., and Venable, Baetjer & Howard, Baltimore, Md., on brief), for appellee.

Before PARKER, Chief Judge, DOBIE, Circuit Judge, and BARKSDALE, District Judge.

PARKER, Chief Judge.

These are appeals from summary judgments for defendant, the publisher of a newspaper, in actions to recover damages for alleged libel in the publication of a newspaper article. After motions to dismiss the complaints in the two actions had been denied and answers had been filed pleading privilege, fair comment and lack of malice, the facts surrounding the publication of the article were established by failure to deny requests for admission and affidavits were filed showing lack of express malice on the part of the managing editor and his assistant responsible for the publication. The trial judge then granted motions by defendants for summary judgments and plaintiffs have appealed. The facts and the applicable law are fully set forth in the opinion of the trial judge and little need be added thereto. See Pulvermann v. A. S. Abell Co., D.C., 131 F.Supp. 617.

The publication complained of was an Associated Press article based in large part upon an article which had appeared in the New York Herald-Tribune and was a comprehensive factual report of the discharge of plaintiff Westbrook from his position with the Democratic National Committee on account of his having negotiated, along with plaintiff Pulvermann, a contract with the government for a Portuguese corporation for the sale of tungsten under which Westbrook and Pulvermann were to receive a commission of 5% on sales. The article, which was published near the end of the political campaign of 1952, gave the facts as to the contract, and the cancellation thereof by the government, the statements of Westbrook and of the official of the government who had made the contract and the comments of the Chairman of the Democratic National Committee, Speaker Rayburn, and General Eisenhower, who was then a candidate for the presidency. The complaint is that the article held plaintiffs up to the public as "five percenters" and as having been engaged in "crookedness". The use of the term "five percenters" was in reporting a comment of the Herald Tribune and an interview by the plaintiff Westbrook himself. The use of "crookedness" was in the report of a speech by General Eisenhower. That these may be understood in the context in which they were used, it is necessary to consider the entire content of the article, which is as follows:

"Larson Asks Metal Deal Probe
Says He Was Unaware Of Fee

"Revenue Chief Dunlap Ignores Subpoena ------Page 4

"Washington, Oct. 30 (AP)—Jess Larson, chief buyer of critical materials for the Government, said today someone under his supervision failed to notify him that a $9,000,000 tungsten contract called for a fee to Col. Lawrence Westbrook, fired last night as a Democratic National Committee official.

"Larson said thus far he has found no evidence of 'wrongdoing or influence' in his agencies in connection with the contract. But he said he has ordered a 'full scale top to bottom investigation.' Will publicly disclose all findings and, if there is evidence of wrongdoing, will refer it to the Justice Department.

### "Denies Political Influence

"Westbrook was dismissed by Stephen A. Mitchell, Democratic national chairman, shortly after the New York Herald-Tribune published a copyrighted story terming the case 'the biggest five per-center deal ever exposed in Washington.'

"In Dallas, Westbrook denied today that he had used or attempted to use his Democratic National Committee position to influence the awarding of the contract.

"'My services to the company were not in any manner of the so-called "five percenter" variety,' Westbrook said in a written statement issued today from his room at the Adolphus Hotel.

"He refused comment beyond that included in his statement and would not answer reporters' questions.

### "Westbrook's Statement

"'At the time I joined the national committee, all essential details of the company's contract had already been agreed to by the Federal Government,' Westbrook's statement said.

"He added: 'However, I realize that under the pressure of the final week of the campaign, Mr. Mitchell's responsibilities may have compelled him to take action without the opportunity of thoroughly checking the facts.'

"Westbrook said, 'The most distressing aspect of the whole matter so far as I am concerned is the feeling that misrepresentation of my position might result in injury to the cause of the Democratic party.'

"He said he was withdrawing from the campaign in Texas, where he has been helping Sam Rayburn, Speaker of the House, on behalf of Adlai Stevenson.

"Larson said he personally will head an investigation to determine whether there was any fraudulent conduct or wrong-doing, or any evidence of the use of influence.

### "Heads Both Agencies

"At present, he said, 'I know of no wrongdoing and have no knowledge of influence having been exercised on any member of any of the organizations which I head.'

"Larson said one thing he wants cleared up is why he was not given an unsigned letter-contract dated August 22, 1951, which disclosed that the tungsten deal involved a 5 per cent fee to Westbrook and another man, Heinz Pulvermann, of Rye, N. Y.

"The fee plan had been disclosed in a letter to the Emergency Procurement Service, but was not forwarded along with other papers in the case when that type of federal buying was taken over by the Defense Materials Procurement Agency, Larson said. He heads both agencies.

### "Larson Signed Contract

"'If I find that someone in this agency deliberately detached the letter', Larson said, 'I will dismiss him from public service and try to find out what his motive was.'

"Larson signed the contract, as head of the Defense Materials Agency, and Westbrook signed on behalf of a Portuguese company which agreed to supply the Government with tungsten, a metal vital in the production of steel.

"Larson said the missing letter telling of the fee arrangement was replaced later on by a new letter, dated February 29 of this year. Larson said he did not know of it at the time he signed the contract and did not know any fee was involved until a Herald Tribune reporter told him so yesterday.

"Had he known any fee was involved, he said, he would not have signed the contract.

"Meanwhile, the contract had already been cancelled before any deliveries were made. The contract, Larson said, called for initial deliveries at $57 a ton, but the market price has since dropped to about $55.

"Contract Violation Charged

"Larson said he had learned that the company for which Westbrook acted was undertaking to buy tungsten at the lower figure and sell it to the Government at the higher price provided in the contract. He said this violated a contract provision that the company was to provide tungsten from mines it controlled.

"Gen. Dwight D. Eisenhower, in a speech in New York City today referred to the case as the 'sort of crookedness (that) goes on and on in Washington.' Of Westbrook, he said, 'they had to fire him because someone caught up with him.'

"Westbrook could not be reached after a telephone conversation with the Herald-Tribune, in which he said he had done nothing wrong. In his statement last night, Mitchell said 'there is no information before me that Colonel Westbrook sought to bring improper influence to bear on any agency or to make improper use of his position with the Democratic National Committee.'

"But Mitchell said he dismissed Westbrook because 'I do not think any exception can be made to the policy that an employee of the committee must not engage in business with the Government.'

"Westbrook, a former army man who is a research and development engineer, has been acting since last January 5 as a liaison man between the Democratic committee and members of Congress. More recently he has been working on the Texas State campaign for the Democratic national ticket.

"Sam Rayburn, Speaker of the House, in charge of that campaign, said in Dallas that Westbrook's dismissal has 'no bearing on the campaign in Texas.'

" 'Whatever Colonel Westbrook's other activities may be they have no bearing on the campaign in Texas,' Rayburn said. 'Our campaign is a fight against the efforts of the Republicans and their oil-rich friends in Texas to take over our State and bring a halt to the economic progress that has been made during the past twenty years.

" 'Regardless of other political developments, actual and contrived, I firmly believe we will be successful next Tuesday in resisting those efforts.'

"Directing Texas Drive

"Rayburn has been directing the drive to hold Texas in the Democratic column despite the switch to Eisenhower by Gov. Allan Shivers and the bulk of the State Democratic organization.

"The contract between the Government and the company for which Westbrook signed took effect September 11. It was canceled on Monday. The announced reason was that the company, Companhia Atlantica, had violated contract terms by going into the open market for tungsten to sell to the United States instead of keeping a pledge to supply the metal from mines it claimed to control.

"Larson said that even if it had not been canceled on that ground, 'we may have canceled the contract anyway had we known' that a Democratic committee aide was connected with it."

The facts pertinent to the publication, as established by the pleadings and admissions, were correctly stated by the trial judge as follows:

"* * * that plaintiff Westbrook served as a member and assistant chair-

man of the Democratic National Committee from January 7, 1952 to October 29, 1952; that for some time prior thereto he had been a research engineer, and that both prior and subsequent to January 7, 1952, he and the other plaintiff, Heinz Pulvermann, had represented Companhia Atlantica, commonly referred to as Atlantica, a Portuguese corporation, in its efforts to secure a contract for sale to the United States Government of Wolframite or Tungsten produced by Portuguese mines; that, as a result, a contract between the United States Government and Atlantica was entered into on September 11, 1952; that at this time and until the Presidential election in 1952, General Dwight D. Eisenhower was the candidate of the Republican party, and Governor Adlai E. Stevenson the candidate of the Democratic party; that during the campaign the plaintiff Westbrook, as a member of the Democratic National Committee, was actively engaged in the support of the candidacy of Governor Stevenson; that on October 29, 1952, plaintiff Westbrook was dismissed by the then chairman of the Democratic National Committee, Stephen A. Mitchell, from his position with this committee, on the ground that no exception would be made in his case to the Committee's policy that an employee of the Committee must not engage in business with the United States Government; that Jess Larson, who signed the contract of September 11, 1952, on behalf of the United States with Atlantica, above referred to, was at that time Administrator of the Defense Material Procurement Agency, as well as Administrator of the Emergency Procurement Service Agency of the Government, and continued to hold such offices through October 31, 1952; that on October 27, 1952, Jess Larson, on behalf of the United States Government, canceled and terminated this contract on the ground that, contrary to the terms of the contract, Atlantica was undertaking to buy Tungsten at a lower figure than that at which it had contracted to sell to the Government; that plaintiff Westbrook, on October 29,

1952, told a reporter for the New York Herald-Tribune that there was nothing wrong about his connection with the Atlantica contract, and that he did not want any publicity on the whole thing at that time; that on October 30, 1952, he issued another statement to the same effect to the press in Dallas, Texas, except that he placed no restriction on the publication of this second statement, as he did on the first, and he issued the additional statement, among others, that since misrepresentation of his position might result in injury to the cause of the Democratic party, he was withdrawing from the political campaign in Texas.

"It further appears from the uncontradicted affidavits of both the managing and the assistant managing editor of the Baltimore Sun that they alone had authority to determine whether a news dispatch from the Associated Press should be published in the Sun; and that while they had no independent recollection of the circumstances concerning the decision to include the article here in issue in the Baltimore Sun of October 31, 1952, one or the other of them must have made the decision to include it; that both the managing editor and the assistant managing editor, before the publication of the article here in issue, were entirely unacquainted with both plaintiffs in this suit, either personally or by reputation, and still are so entirely unacquainted; that no instructions had been received by them from any of their superiors to publish stories in the Baltimore Sun because of their superiors being either favorable or opposed to the Democratic or Republican party or their respective candidates for President in the 1952 campaign; that throughout the 1952 campaign for the Presidency, both the managing editor and the assistant managing editor of the Sun were supporters of the candidacy of the Democratic candidate Stevenson; that as duly qualified and registered voters they voted for him, and that neither of them has had, either prior or subsequent to the publication in the Baltimore Sun of the article here in

issue, any ill will or malice toward either of the plaintiffs in the present suits."

On these facts, we think it perfectly clear that the court below was correct in holding that the publication of the article, relating as it did to a matter of public business and to a comment thereon by a candidate for the presidency in the course of a political campaign, was qualifiedly privileged, for which there was no liability in the absence of express malice, and also in holding that the absence of express malice was established so conclusively that there was no substantial question to be submitted to a jury with regard thereto. The right and duty of newspapers to publish for the benefit of the public matters of this character is well recognized; and, in the age in which we are living, popular government could hardly function if this were not true. Of course, newspapers should be held strictly accountable where they maliciously or recklessly publish false statements for the purpose of injuring candidates or their supporters; but where a high official in the national organization of a political party is dismissed from his position in the party because he has been accused of dealing with the government and where a candidate for the presidency of the country comments on the matter in a public address, it is unthinkable that newspapers should not be allowed to give publicity to the matter without fear of being held to liability therefor in a libel suit. The contract with the government was a matter of public business, as to which the right of comment by the newspapers is a matter of prime importance, and so also was the fact that a party official engaged in a political contest then in progress has been discharged from his position in the party because of his having negotiated the contract for profit to himself. See 33 Am.Jur., p. 161 et seq.; A.L.I. Restatement of Torts, section 607 and Comments; Gandia v. Pettingill, 222 U.S. 452, 457, 32 S.Ct. 127, 56 L.Ed. 267. The privilege of fair comment with respect to such matters is recognized by the law of Maryland, by which this case is governed, as it is elsewhere. Snyder v. Fulton, 34 Md. 128, 137; Negley v. Farrow, 60 Md. 158, 177.

There is a conflict in authority as to whether the privilege of fair comment extends to repetition of false statements of fact. See note 110 A.L.R. 412 et seq. and 435 et seq. The rule in Maryland is that repetition of false statements is not privileged. Negley v. Farrow, supra; Richardson v. State, 66 Md. 205, 7 A. 43. No false statements of fact, however, are contained in the article here complained of. There is no question as to the truthfulness of the statement that Westbrook had been discharged from his position with the Democratic National Committee, or that he had been discharged because of the contract which he and Pulvermann had made with the government for it to purchase tungsten from the Portuguese corporation, or that he and Pulvermann were to receive a commission of 5% on the contract. The only portions of the article of which plaintiffs can complain as not being statements of fact is that portion relating to the Herald–Tribune's terming the case "the biggest five percenter deal ever exposed in Washington" and General Eisenhower's referring to it as the "sort of crookedness that goes on and on in Washington". These, however, cannot be deemed unfair comment when read, as they must be, in connection with the remainder of the article, which sets forth in detail the facts to which the comments relate and carries the statement of Westbrook with regard thereto including his denial that he had used or attempted to use his position to influence the awarding of the contract or that his services were of the "so-called 'five percenter' variety". In view of the fact that Westbrook gave this statement to the press in an interview to be published, he is hardly in position to complain of the publication with it of the charge to which it was an answer, even if the latter were otherwise objectionable.

Of course the privilege of fair comment as to matters of public concern cannot be used to justify a malicious pub-

lication; but we do not think that there is any substantial question of malice for trial in these cases. The nature of the article itself goes far toward negativing the malice alleged, being an objective, factual report of a campaign incident which lent itself readily to a much more lurid presentation. The fact that the newspaper was supporting the candidacy of General Eisenhower did not tend to establish malice or deprive it of the privilege of fair comment. In addition it appears that the managing editor and his assistant, who were responsible for publication of the article, were supporters of General Eisenhower's opponent.

Plaintiffs argue that malice is shown by the fact that the report of General Eisenhower's speech in the article as published was not in the exact language used by him. The variance, however, is immaterial and is such as might reasonably be expected in abbreviation. The language used was: "Did you notice in this morning's paper about a five-percenter who had a two or three hundred thousand dollar deal cooked up for himself? They had to fire him last night because someone else caught up with him. It keeps going on and on. They have had crookedness in the administration. They have had subversion and disloyalty in the administration. How would you like to defend that record?" The statement in the article complained of was: "Gen. Dwight D. Eisenhower, in a speech in New York City today referred to the case as the 'sort of crookedness (that) goes on and on in Washington.' Of Westbrook, he said, 'they had to fire him because someone caught up with him.'" The language of the article was certainly milder than the comment of General Eisenhower in his speech.

While we have said repeatedly that summary judgment should not be entered where any issue of fact remains undetermined in the case, we do not think that, in the light of the record here, any issue remained for trial.

Affirmed.