Thomas GREEN, M.D., Appellant,

v.

NORTHERN PUBLISHING CO., INC.,
d/b/a Anchorage Daily News, a
business corporation, Appellee.

No. 5448.

Supreme Court of Alaska.

Nov. 12, 1982.

James J. Delaney, John M. Moxness, Delaney, Wiles, Moore, Hayes & Reitman, Inc., Anchorage, for appellant.

A. Robert Hahn, Jr., Stan B. Stanfill, Hahn, Jewell & Stanfill, Anchorage, for appellee.

Before RABINOWITZ, C.J., and CONNOR, BURKE, MATTHEWS and COMPTON, JJ.

## OPINION

BURKE, Justice.

The issue in this appeal is whether the superior court erred in granting summary judgment in favor of the defendant, in a libel action that arose out of an editorial appearing in defendant's newspaper.

## I.

On December 29, 1975, David Selberg, a young pipeline worker, was arrested for disorderly conduct, after friends complained about his behavior at their home.[1] Selberg remained in jail for nine days, during which time he was examined by the plaintiff below, Thomas Green, M.D. Just after midnight, on January 7, 1976, Selberg died in his cell. According to the autopsy report,[2] Selberg died of natural causes, unrelated to his incarceration: spontaneous "bilateral pneumothorax," a condition involving the sudden collapse of both lungs.

Dr. Green had contracted with the state to provide medical services for the five correctional institutions in the Anchorage area.[3] He was in charge of coordinating all medical services in these institutions, and responsible for several part-time and full-time medical assistants. Dr. Green's routine included two visits a week to the jail where Selberg was held. He was alerted to medical emergencies by his medical assistants who visited the jails six days per week.

Two hours before Dr. Green's usual visit to the jail on December 29, 1975, he received a specific request to see Selberg, after a district court judge found Selberg unable to go through the arraignment procedure and ordered a medical evaluation. Dr. Green determined that, although Selberg was in good physical health, he was disoriented, "hallucinating wildly," and physically agitated to the point where he was running naked around his cell. Since Dr. Green was a general practitioner, not a psychiatrist, he recommended that Selberg be removed "as soon as possible" from the jail and taken to a psychiatric facility for treatment and diagnosis. Prison policy required a court order authorizing the removal of a prisoner from the jail to obtain medical treatment. According to Dr. Green, he received the following oral instruction from his supervisor only a month or two prior to Selberg's incarceration:

1. Earlier, his friends tried unsuccessfully to have Selberg committed to the Alaska Psychiatric Institute.

2. The autopsy was performed by a pathologist, Michael Beirne, M.D.

3. Dr. Green was also in private practice.

"Dr. Green, you in all instances, when we were [sic] certifying men out of this institution, you will abide by the Court Order method, and examine, make your recommendation, and it will be followed from there, using the Court System." [4]

Although such an order was issued by the district court, on December 30, 1975, the psychiatric examination was not scheduled until January 7, 1976. The court was aware of Dr. Green's recommendation that Selberg be moved "as soon as possible," but the judge did not interpret this as meaning that an immediate examination was required. The judge stated that he thought eight days between the order and the scheduled examination was relatively short since it usually took longer due to difficulties with bookings with the psychiatrists. During the nine days that Selberg was incarcerated, an attorney was never appointed to represent him.

Dr. Green did not see Selberg again until January 5, about twenty-eight hours before he died. During the period Selberg was incarcerated, his situation did not improve. Most of the time, Selberg was naked in a room where the temperature was about seventy-two degrees Farenheit, without blankets or a mattress. Apparently, Selberg would throw these objects against the wall of his cell. He was constantly disoriented. It was difficult and sometimes impossible for the correction officers to get Selberg to eat, and the officers could see that he was losing weight every day. When they could get Selberg to accept food, he would throw it on the floor or in the toilet and eat it from there. Sometimes, Selberg would cover his naked body with food and excrement. He was constantly active, throwing himself into the metal slab that was his bunk, and banging his head and body against the walls. Since Selberg refused to take showers, the officers forcibly administered them to him.

When Dr. Green arrived at the jail on January 5, he was surprised to learn that Selberg had not yet been removed from that facility. Dr. Green gave him a cursory examination, which consisted of observing Selberg through the window in the cell door. This was the same method of examination Dr. Green's medical assistants used while Dr. Green was away. Dr. Green was given a report of Selberg's activities between the 29th and the 5th.

A few minutes past midnight on January 7, the day scheduled for his psychiatric examination, Selberg died.

After Selberg's death and a coroner's inquest, the Anchorage Daily News commenced a series of news articles investigating the circumstances surrounding Selberg's death. These articles culminated in the editorial forming the basis for this action:

Finally, the state has recognized its responsibility for the death of David Paul Selberg.

The 23-year-old pipeline worker died in an Anchorage jail Jan. 7. In February a coroner's jury ruled that death was from natural causes. Then everyone involved chose to drop the sordid matter—to forget that a very sick man who had committed no crime had been locked in a 8½ by 7½ foot concrete cell for nine days and left to die.

Earlier this month, The Daily News published an exclusive series on Selberg's death after an extensive investigation. Soon after, the state Department of Health and Social Services (HSS) began to look into the case, and Atty. Gen. Avrum Gross stated that although the Anchorage District Attorney's Office felt they could not prove criminal negligence, his office would act in an advisory capacity to HSS.

Since then, HSS Commissioner Frank Williamson has taken steps to assure that such a tragedy does not happen again.

First, he abruptly cancelled the $125,-000 a year contract of Dr. Thomas F. Green, the physician serving Anchorage jails for the past six years.

---

4. Apparently, this policy was adopted after an incident a year earlier, where an inmate, while being taken to a dental appointment, escaped and shot a police officer.

Second, he held a meeting last week in Juneau with heads of the divisions of Corrections, Mental Health and Public Safety and members of the state court system.

Third, as a result of that meeting, he has appointed a committee to meet here April 16 for a day-long conference. This group is comprised of "principal figures in the criminal justice system and the private medical community" in Anchorage. Its purpose will be to establish definitive procedures for handling disturbed citizens such as Selberg, and to delineate clearly the responsibilities of the city police, the state troopers, the courts, the jails and our mental health facilities toward persons in their charge.

Mr. Williamson's candor in the case is in welcome contrast to others more directly connected with the Selberg death. The actions he has taken so far have been constructive, if overdue.

We hope that the April 16 meeting here will reflect the same spirit. We need positive results from those participating, for they are the ones who serve our community and must assure our safety.

*Anchorage Daily News,* March 24, 1976.

Thereafter, Dr. Green brought a libel action against the newspaper's owner, Northern Publishing Co., Inc., alleging that the editorial was defamatory. The superior court granted summary judgment in favor of the defendant, holding that the editorial was not capable of a defamatory interpretation and that the plaintiff could not satisfy the "actual malice" requirement of *New York Times Co. v. Sullivan,* 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964). This appeal followed.

## II.

■ A communication is defamatory if it tends to harm the reputation of another so as to lower him in the estimation of the community or to deter third persons from associating or dealing with him. *See* Restatement (Second) of Torts § 559 (1977). The superior court found no suggestion in the editorial that Dr. Green was responsible for Selberg's tragic death. Partly on that basis it granted summary judgment. See Rule 56, Alaska R.Civ.P. We disagree and hold the defendant's editorial capable of a defamatory interpretation.

■ The editorial did not merely report the actions that the Commissioner of Health and Social Services had taken in response to the Selberg incident, and then express its opinion approving those actions. Nor did it merely imply that the Commissioner believed that Dr. Green was partially at fault for Selberg's death. The alleged defamation relevant to this case is that the editorial under one interpretation seems to further imply that the Daily News agreed with the Commissioner and presented as fact the allegation that Dr. Green was at least partially responsible for Selberg's death. Since this is a reasonable interpretation of the meaning of the editorial, summary judgment on the issue whether the communication was defamatory should not have been granted.

First, it is clear that the editorial implies that the Commissioner believes that Dr. Green was partially at fault for Selberg's death. The editorial begins with the statement that the state has "recognized its responsibility" for Selberg's death. It goes on to state that the Commissioner "has taken steps to assure that such a tragedy does not happen again. First, he abruptly cancelled the $125,000 a year contract of Dr. Thomas F. Green . . . ." Dr. Green is the only person named in the editorial who was related to Selberg's death. The Commissioner is said to have fired Dr. Green to prevent another tragic death such as Selberg suffered. The clear implication is that the Commissioner believed Dr. Green to be at least partially responsible for the death.

It is also clear that the Daily News was expressing its agreement with the state official regarding Dr. Green's responsibility. In the second paragraph of the editorial the Daily News said that Selberg was "a very sick man" who was "locked in a . . . cell . . . and left to die." This directly implies that Selberg was seriously ill at the time he

was incarcerated and died in the jail when that illness was neglected. Having thus asserted that the treatment Selberg received caused his death, the Daily News then showed its agreement with the view that Dr. Green was at least partially responsible. It was the Daily News, after all, that phrased the statement that "[s]ince then, HSS Commissioner Frank Williamson has taken steps to *assure* that such a tragedy does not happen again." (Emphasis added.) Then, the Daily News stated that "[t]he actions he has taken so far have been constructive, if overdue." The first of those actions, of course, was the firing of Dr. Green.

In conclusion, we hold the editorial susceptible of being reasonably interpreted as meaning that the Daily News, "after an extensive investigation," believed Commissioner Williamson was correct in concluding that Dr. Green was at least partially responsible for David Selberg's death. Such a meaning is clearly defamatory.

### III.

Defamation defendants have two defenses—truth and privilege. The United States Supreme Court in *New York Times Co. v. Sullivan,* 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964), held that a state law which allowed only the defense of truth was an unacceptable burden on a media defendant's freedom of expression. Since the constitutional interest in freedom of speech and press required more, the court recognized a conditional constitutional privilege for media defendants in defamation suits brought by "public officials." The "condition" was that the privilege applied only if the media defendant had not uttered the defamation with "actual malice," *i.e.,* with actual knowledge that its utterance was false or with reckless disregard for its truth or falsity. *Id.* at 279–80, 84 S.Ct. at 725–726, 11 L.Ed.2d at 706. For the purpose of asserting the privilege, the defendant concedes falsity but claims that because it lacked "actual malice," its defamatory utterance is protected under the First Amendment. Eaton, *The American Law of Defa-*

*mation Through Gertz v. Robert Welch, Inc. and Beyond: An Analytical Primer,* 61 Va. L.Rev. 1349, 1381–86 (1975).

The Daily News asserts this conditional constitutional privilege in the case at bar. Partly on that basis, it was granted summary judgment, because the trial court believed that reasonable jurors could not find that it published the editorial with "actual malice." Dr. Green attacks that conclusion on two theories: (A) the Daily News cannot hold the privilege in this case because Dr. Green was not a "public official," and (B) even if the Daily News holds the privilege, summary judgment on the issue of "actual malice" was improper.

### A. *Is Dr. Green a "Public Official"?*

In *New York Times,* the Supreme Court limited application of the new constitutional privilege to those defamatory falsehoods which dealt with the "official conduct" of a "public official." *Id.* at 279, 84 S.Ct. at 725, 11 L.Ed.2d at 706. The perimeters of the defense were drawn shortly thereafter in *Rosenblatt v. Baer,* 383 U.S. 75, 86 S.Ct. 669, 15 L.Ed.2d 597 (1966):

> [T]he "public official" designation applies at the very least to those among the hierarchy of government employees who have, or appear to the public to have, substantial responsibility for or control over the conduct of governmental affairs.
>
> . . . Where a position in government has such apparent importance that the public has an independent interest in the qualifications and performance of the person who holds it, beyond the general public interest in the qualifications and performance of all government employees, . . . the *New York Times* malice standards apply.

*Id.* at 85–86, 86 S.Ct. at 675–676, 15 L.Ed.2d at 605–06.

The boundaries of the "public official" concept were further amplified in a footnote:

> It is suggested that this might apply to a night watchman accused of stealing state secrets. But a conclusion that the *New York Times* malice standards apply could

not be reached merely because a statement defamatory of some person in government employ catches the public's interest; that conclusion would virtually disregard society's interest in protecting reputation. The employee's position must be one which would invite public scrutiny and discussion of the person holding it, entirely apart from the scrutiny and discussion occasioned by the particular charges in controversy.

*Id.* at 86 n. 13, 86 S.Ct. at 676 n. 13, 15 L.Ed.2d at 606 n. 13.

■ Dr. Green contracted with the state to provide medical services to the five jails in the Anchorage area. His annual contract for $125,000 had to cover salaries for seven full and part-time employees. Dr. Green himself devoted three-quarters of his time to performing this contract; his remaining time was spent in private practice. He was responsible for training and supervising his medical assistants, as well as the coordination of the effort to supply routine and emergency services on a twenty-four hour basis. Dr. Green followed procedures established by the Department of Corrections, including the requirement of a court order to release an inmate for medical treatment. He was head of a small operational unit providing a specific limited service to a local element of a state agency. We conclude, therefore, he was not a policymaker or a member of the governmental "hierarchy" charged with "substantial responsibility" for the conduct of governmental affairs.

Dr. Green's position was not highly visible in the community and usually attracted little "public scrutiny." His position was of the type which generally remains unnoticed until something controversial occurs. In fact, the functioning of his unit and of Dr. Green himself did not come under critical public attention until the unfortunate death of an individual whose grave condition developed while under the unit's medical supervision. Thus, one could argue that Dr. Green's position did not invite public scrutiny "*entirely apart* from the scrutiny and discussion occasioned by the particular

charges in controversy." *Rosenblatt v. Baer,* 383 U.S. at 86 n. 13, 86 S.Ct. at 676 n. 13, 15 L.Ed.2d at 606 n. 13.

In spite of the foregoing, we believe that the person directing the provision of medical services to all Anchorage area state inmates holds a position of sufficient importance that the public has "an independent interest in the qualifications and performance of the person who holds it beyond the general public interest in the qualifications and performance of all government employees." *Id.* at 86, 86 S.Ct. at 676, 15 L.Ed.2d at 606. The significance of this independent public interest is not lessened by the normally quiescent character of the public job. We therefore hold that Dr. Green was a "public official" and that the "actual malice" standard applies to his defamation action against a media defendant.

### B. *Was summary judgment on the "actual malice" issue properly granted?*

■ The "actual malice" test is satisfied if the plaintiff can show with convincing clarity that the defamatory falsehood was made "with knowledge that it was false or with reckless disregard of whether it was false or not." *New York Times,* 376 U.S. at 279–80, 84 S.Ct. at 725–726, 11 L.Ed.2d at 706. In order to apply the test to this case, it is necessary to determine the meaning of the "reckless disregard" standard.

■ Mere negligence on the part of the defendant is not enough to overcome the privilege and permit a public official to recover against a media defendant. *See, e.g., St. Amant v. Thompson,* 390 U.S. 727, 88 S.Ct. 1323, 20 L.Ed.2d 262 (1968):

> [The] cases are clear that reckless conduct is not measured by whether a reasonably prudent man would have published, or would have investigated before publishing. There must be sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of his publication.

*Id.* at 731, 88 S.Ct. at 1325, 20 L.Ed.2d at 267.

■ "Reckless disregard," for these purposes, means conduct that is heedless and shows a wanton indifference to consequences; it is conduct which is far more than negligent. *Mahnke v. Northwest Publications, Inc.,* 280 Minn. 328, 160 N.W.2d 1, 15–16 (1968). There must be sufficient evidence to permit the inference that the defendant must have, in fact, *subjectively entertained serious doubts as to the truth of his statement.* *Widener v. Pacific Gas & Electric Co.,* 75 Cal.App.3d 415, 142 Cal. Rptr. 304, 314 (1977) (emphasis added).

■ On a motion for summary judgment, the moving party must establish the absence of a material issue of fact and the court is required to draw all reasonable inferences in favor of the non-movant. *Clabaugh v. Bottcher,* 545 P.2d 172, 175 (Alaska 1976). Here, we have already determined that reasonable jurors could find that the Daily News stated that Dr. Green was at least partially responsible for David Selberg's death. The question then, is whether this statement was made with knowledge or at least with serious doubt as to its truth. To be entitled to summary judgment, the defendant must establish that there was no triable issue of fact on this question.

Dr. Green argues that since the Daily News was aware of strong evidence showing that Selberg's death was not related to the medical treatment he received in jail, a reasonable person could conclude that the Daily News acted with "actual malice," as that term is used here, and therefore, the question must go to a jury. The primary evidence to support Dr. Green's argument is the testimony and coroner's report of Dr. Michael Beirne, the pathologist who performed the autopsy on Selberg. Dr. Green also points to the coroner's inquest, which found that Selberg's death was from natural causes and not due to criminal negligence. It is not disputed that both Nancy Doherty, the Daily News reporter, and Stan Abbott, the executive editor of the Daily News, were aware of this evidence.

At the coroner's inquest, Dr. Beirne testified that Selberg had died suddenly and unexpectedly from a spontaneous "bilateral pneumothorax," which is caused by air leaking out of the lungs into the chest cavity. The leak that caused Selberg's lungs to collapse occurred without apparent external influence, hence the term "spontaneous." In effect, Dr. Beirne believed that Selberg's unbalanced mental condition did not contribute to the collapse. Also, Dr. Beirne believed that there may not have been any symptoms to alert Dr. Green or his assistants to the possibility or onset of a pneumothorax.

The result is that the writers of the editorial knew of substantial evidence that Dr. Green was not responsible for Selberg's death. Therefore, we must reverse the trial court's order of summary judgment unless we find that in spite of this substantial evidence, the defendant, as a matter of law, could not have entertained any serious doubts as to the truth of its assertion that Dr. Green was in some way responsible for Selberg's death.

The defendant's best hope of avoiding recklessness lies in Ms. Doherty's awareness of the views of Dr. Francis Williamson, Dr. Green's ultimate superior and the Commissioner of Health and Social Services at the time of Selberg's death.[5] Commissioner Williamson, who is not a medical doctor, but a naturalist with a Ph.D., made certain relevant statements to Ms. Doherty which can be divided into three excerpts. These statements were published in the Daily News in articles written by Ms. Doherty. The first was made nearly two weeks before the March 24 editorial. Commissioner Williamson said:

### FIRST EXCERPT

I am not trying to be defensive; we are all guilty .... The fact is the man died

---

**5.** Ms. Doherty, the reporter, also claims that she talked to two pathologists outside of Alaska who were skeptical of Dr. Beirne's conclusion that nothing that happened to Selberg during his incarceration contributed to his death.

However, Ms. Doherty could not recall the names or addresses of the pathologists, how she came in contact with them, or even locate the notes of those conversations.

and he should not have died ... I think we can stop it from happening again.... It looks like a total foul-up.... There was a major breakdown in just about every element of the system. If anyone along the way had made another decision, Selberg would still be alive.

In a March 10 article, Commissioner Williamson seems to strongly imply that Dr. Green's efforts to get Selberg transferred from the jail were inadequate. The following is a portion of the article:

### SECOND EXCERPT

Williams[on] said Tuesday that persons suspected of being mentally ill frequently wind up in jail on minor charges. The procedure for getting them treatment—through medical examination, a written opinion from the doctor informing the court and then an eventual court order—was ordinarily "adequate and timely." In this case, however, he said, "it was not made plain to anyone that this guy was really very sick." Both the arresting officers and the judge involved in the case have attested to the difficulty of getting a mentally disturbed and possibly violent person such as Selberg admitted to the Alaska Psychiatric Institute (API). Williamson, however, believed that these statements arose from misinformation rather than fact. "There was nothing to stop anyone—the law enforcement people or corrections or the medical staff—from making an on-the-spot decision, picking up the phone and calling API. I have trouble with all of it," he continued. "Especially the medical end."[6]

Finally, Ms. Doherty conducted a television interview of Commissioner Williamson where he gave his view concerning the cause of Selberg's death. This piece of evidence is inconclusive, however, because the record does not indicate when the inter-

view occurred. If the interview occurred after the editorial was published, it would bear no relevance to the writer's awareness of the editorial's probable truth or falsity.[7] The excerpt from this television interview was as follows:

### THIRD EXCERPT

Doherty: You stated to me in an earlier interview that if anyone involved with David Selberg along the way had made a different decision that he might be alive today. Can you explain what you meant by that?

Williamson: What I meant by that was first of all, David's death was by natural causes as determined by the coroner's inquest. The autopsy revealed a spontaneous [p]neumothorax, both lungs, cause unknown, and it can logically be assumed that no one could have averted his death. That's one possibility. Another is that the predisposing condition to his ultimate physical condition might have been changed, I don't know, by medical attention in a proper setting and I do think that had anyone along the way, friends, police officers, corrections personnel, or whatever, been adamant in describing and emphasizing the emergency nature of his condition, he would have ended up in a different physical setting and under a different regimen of care and I think it is quite likely that the medical problems that arose his last day of life might have been averted. No one can really answer that.

It is our determination that the statements from Commissioner Williamson to Ms. Doherty are insufficient to conclusively overcome the testimony and coroner's report of Dr. Beirne. We conclude that reasonable jurors could disagree as to whether the defendant entertained serious doubts about the truth of its assertion that Dr.

---

**6.** It is significant to note that in the second sentence of this excerpt, Ms. Doherty acknowledges *her understanding* that under the procedure *then in force* at the jail, Dr. Green was not responsible for doing any more than he actually did—making his recommendation to the court

that David Selberg receive a psychiatric examination "as soon as possible."

**7.** The date of this interview and therefore its relevance to the recklessness issue should be determined at trial.

Green was in some way responsible for Selberg's death.[8]

Thus, a material issue of fact existed, and summary judgment on the issue of "actual malice" was improperly granted.

REVERSED and REMANDED for further proceedings.

COMPTON, J., concurs.

MATTHEWS, J., dissents, with whom CONNOR, J., joins.

COMPTON, Justice, concurring.

Although I agree with the result reached in this case, I cannot subscribe to the reasoning leading to the conclusion that Dr. Green is a "public official."[1] Indeed, I conclude that the "actual malice" standard is applicable as a function of state law because the publication concerned a matter of public interest: whether Dr. Green is a "public official" as that term is understood within the relevant federal authorities is simply not relevant.

In *Pearson v. Fairbanks Publishing Co.,* we expressly ignored the limitations imposed by *New York Times* with the following language:

> On the one hand there is the interest in safeguarding the right to one's reputation. On the other hand there is the interest in allowing freedom of debate and expression on public questions and issues. We believe that a fair balance of these competing interests is achieved where the law of defamation permits one, without liability for damages, to comment, criticize and pass judgment on statements made by another *on an issue or matter of public interest,* even if such comment, criticism and judgment involves misstatements of fact—so long as such misstatements are relevant to the subject matter spoken or written about by the one claiming to be defamed and

are not shown by him to have been made with *actual malice.* (Emphasis added.)

413 P.2d 711, 713 (Alaska 1966). In view of this holding, we found it unnecessary to speculate whether the United States Supreme Court would extend "actual malice" protection where defamatory falsehoods involved other than official conduct of public officials.

Eventually, the United States Supreme Court did extend *New York Times* standard to events of public or general concern. *Rosenbloom v. Metromedia, Inc.,* 403 U.S. 29, 91 S.Ct. 1811, 29 L.Ed.2d 296 (1971) (plurality opinion). We relied upon the *Rosenbloom* plurality opinion in deciding *West v. Northern Publishing Co.,* 487 P.2d 1304 (Alaska 1971). Curiously, *West* made no reference to *Pearson,* resting instead on *Rosenbloom* by application of the supremacy clause.

The plurality opinion in *Rosenbloom,* which set forth a view which never commanded the support of a majority of the Court, was ultimately rejected in *Gertz v. Welch,* 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974). The *New York Times* exception was clearly reserved for public officials and public figures, as a matter of federal constitutional law. However, the Court was explicit in reserving to the states ". . . substantial latitude in their efforts to enforce a legal remedy for defamatory falsehood injurious to the reputation of a private individual." 418 U.S. at 345–46, 94 S.Ct. at 3010, 41 L.Ed.2d at 809.

While the Supreme Court has come full circle, *Pearson* stands on its own, needing support from neither *New York Times* nor *Rosenbloom.* It is the law in this state, and whether Dr. Green is a public official involved in official conduct, or a public figure, is entirely irrelevant. The publication at issue in this case plainly concerned "an issue

---

**8.** Since this is a review of a grant of summary judgment for the defendant, we are required to draw all reasonable inferences in favor of the plaintiff. *Claubaugh v. Bottcher,* 545 P.2d 172, 175 (Alaska 1976).

**1.** I find the attempt to categorize Dr. Green a "public official" a very convincing argument that he is not. Since resolution of that issue is unnecessary to decide this case, I will not belabor the point. It speaks for itself.

or matter of public interest," [2] and as a consequence a showing of actual malice is required by state law, independent of any related federal constitutional considerations.

MATTHEWS, Justice, with whom CONNOR, Justice, joins, dissenting.

A communication is defamatory if it tends to harm the reputation of a person. In this case, merely reporting the fact that Dr. Green's contract had been revoked by the Commissioner as a result of Selberg's death had the effect of damaging Dr. Green's reputation. The sequence of events carries with it a factual implication that Dr. Green had some role in causing the death. It may well be that such an implication is false. However, it is plain that the report of the revocation is privileged, and will not support an action for defamation.[1]

The editorial in question makes the factual report that Dr. Green had been terminated by the Commissioner following Selberg's death. In addition, it commends the Commissioner for that act, among others. In so doing the editorial is merely expressing an opinion. The opinion is favorable to Commissioner Williamson and thus, implicitly, critical of Dr. Green. The subject is a matter of public concern. The underlying sequence of events, the treatment Selberg received, his death, and the dismissal of Dr. Green, are true. The implication of fault on the part of Dr. Green is inherent in the fact of his dismissal and therefore privileged. Since there is no evidence that the expression of opinion did not represent the actual opinion of the editor of the Daily News or that the expression was made for the purpose of causing harm to Dr. Green, the editorial is within the fair comment privilege to the law of defamation.

Restatement of Torts § 606(1) (1938) sets out the fair comment doctrine:

(1) Criticism of so much of another's activities as are matters of public concern is privileged if the criticism, although defamatory,

(a) is upon,

(i) a true or privileged statement of fact, or

(ii) upon facts otherwise known or available to the recipient as a member of the public, and

(b) represents the actual opinion of the critic, and

(c) is not made solely for the purpose of causing harm to the other.

Section 607(2) of the Restatement contains a specific application of the fair comment privilege pertinent to this case:

The privilege of criticism stated in § 606 includes a privilege to criticize the work of independent contractors which is being paid for out of public funds and the work of employees of such contractors.

The illustration to this subsection states:

The A newspaper in an editorial criticises the character of work which B, an independent contractor, is doing on the streets of X. The editorial is privileged criticism.

*Id.* comment k, illustration 3.

Based on the foregoing I would affirm the judgment of the superior court. I will, however, make several further observations.

First, if the editorial is treated as somehow defamatory independent of the natural defamatory meaning inherent in the fact of Dr. Green's dismissal, the gist of the defamation lies in the imputation of neglect to Dr. Green. The editor of the Daily News had no reason to doubt that such neglect existed, for he had before him the comments of those jurors who served on the coroner's jury who asked that written ex-

---

**2.** *Pearson v. Fairbanks Publishing Co.,* 413 P.2d at 713.

**1.** *Pulvermann v. A.S. Abell Co.,* 228 F.2d 797, 802 (4th Cir. 1956) states:

[W]here a high official in the national organization of a political party is dismissed from his position in the party because he has been accused of dealing with the government . . . it is unthinkable that newspapers should not be allowed to give publicity to the matter without fear of being held to liability therefor in a libel suit.

planations for their verdict be read into the record. Juror Evelyn Moorehead stated:

Because the cause of death, spontaneous pneumothorax, could have taken place at any time and any place I could not find criminal negligence, however, there is—there are questions left unanswered because we do not know what causes spontaneous collapse of both lungs. *There was certainly negligence involved in David Selberg's treatment; (1) the length of time between his incarceration and his psychiatric appointment, (2) the cursory medical examination of David Selberg, (3) the care of David Selberg while he was incarcerated.* These three things point at a needless indifference to the rights and—rights of safety of one David Selberg.

Juror Marie Dickey stated:

Although I could find no one person guilty of negligent homicide in the death of David Selberg, I do strongly feel that there was negligence perpetrated on him in life. He should have had an attorney appointed to look after his interest. It became obvious when he was looked on the 29th that he was in—booked on the 29th that he was incapable of looking out for his own interests. I believe also that these people who had contact with him at the correctional institute should have pushed harder for psychiatric help. *Dr. Green and/or his physician assistants should have followed up vigorously for his request for an examination. Dr. Green should have realized Mr. Selberg might be suffering from a bad LSD reaction.* Mr. Moses [the correction superintendent] should have checked records and became aware that Mr. Selberg had been in jail, incoherent, unclothed, unwilling to eat and in general completely out of his head and an emergency request initiated on his behalf for psychiatric and medical help in an institution equipped for this. Better, more complete records should be kept of the prisoner's actions than these indicated on the form shown to the jury, observation cumulative. These records should be reviewed by someone person who has authority to recommend medical help for prisoners needing it.

Finally, Juror William Anderson commented:

With the additional instructions provided by the court I could reach no verdict but that which has been submitted. No one individual involved in the tragedy of David Paul Selberg can be held responsible as the direct or proximate cause of death, however, as contributory negligence abounds I think it is in the best interest of the people of Alaska to expose this negligence and demand reform . . . I believe an attorney should have been appointed for Mr. Selberg without delay. Only in this manner could the rights of Mr. Selberg have been protected on this law of this state—as the law of this state requires. *Even though it is doubtful that any physician on earth could have prevented Mr. Selberg's death I feel that the medical attention received was minimal. I find it hard to believe that a 20th century physician would tolerate the filth exhibited in the photos* Investigator Barnard processed of the corpse. *Neither can I understand why that physician would allow a period of over a week to pass without his patient receiving psychiatric treatment when his order for treatment was amplified with, "ASAP."* The command structure of the correctional center is unbelievable. Not one individual took the initiative to seek phychiatric help for an individual so obviously in need. [Emphasis added].

The Daily News editor could also have relied on the views of Commissioner Williamson, Dr. Green's ultimate superior at the time of Selberg's death. In interviews with the Daily News on March 10 and 11, 1976, nearly two weeks before the March 24 editorial, Commissioner Williamson stated:

[W]e are all guilty.

The fact is the man died and should not have died. I think we can stop it from happening again.

It looks like a total foul-up. There was a major breakdown in just about every element of the system. If *anyone* along

the way had made another decision, Selberg would still be alive.

Williamson strongly implied that Dr. Green's efforts to get Selberg transferred from the jail were inadequate:

> Williams said Tuesday that persons suspected of being mentally ill frequently wind up in jail on minor charges. The procedure for getting them treatment— through medical examination, *a written opinion from the doctor informing the court* and then an eventual court order— was ordinarily "adequate and timely." In this case, however, he said, "*It was not made plain to anyone that this guy was really very sick.*"
>
> Both the arresting officers and the judge involved in the case have attested to the difficulty in getting a mentally disturbed and possibly violent person such as Selberg admitted to the Alaska Psychiatric Institute (API). Williamson, however, believed that these statements arose from misinformation rather than fact. "There was nothing to stop anyone—the law enforcement people or corrections or the *medical staff*—from making an on-the-spot decision, picking up the phone and calling API. I have trouble with all of it," he continued. "*Especially the medical end.*" [Emphasis added].

Second, the editorial does make it clear that Selberg was found by the coroner's jury to have died of natural causes. Further, the editorial followed a series of Daily News articles concerning Selberg's death. These articles reported: Selberg died of "collapsed lungs" due to natural causes (February 28, 1976); "[t]he autopsy report says the 'death appears to be on the basis of natural causes'" (March 1, 1976); "Selberg died of collapsed lungs after nine days of irrational behavior" (March 2, 1976); "[t]he coroner's inquest ruled 'death from natural causes'; both lungs had collapsed" (March 3, 1976); "a coroner's jury ruled that death was from 'natural causes'" (March 12, 1976). And, importantly, Dr. Green's position on this matter was fully reported:

January 5, the day before Selberg died, the doctor observed him through the plexiglass window of his cell, lying on the floor and "breathing in normal fashion."

"I ascertained that he was scheduled to see a psychiatrist and we all breathed a sigh of relief."

By that time, according to other testimony from guards and the autopsy report, the man had lost a great deal of weight and was severely dehydrated.

However, Green explained, he saw no need to go in and examine Selberg again. "As it turned out, it's a natural death. I doubt if it would have made any difference," he said, "This is the way I've rationalized it to myself."

Pointing out that he is not a "chest man," Green went on to speculate that Selberg may have had weak spots on the surface of his lungs—"a freakish lesion" —that could have developed spontaneous leaks by his falling or stumbling and hitting the bunk.

"As with all my patients, I had appropriate concern for the man," Green concluded. "I felt that I had done the right thing. Given all the facts, I believe I'd do the same thing again." [March 9, 1976].

Thus, the position now taken by Dr. Green that Selberg died of natural causes having nothing to do with his confinement was often set forth by the Daily News. It is true that the editorial which reported Dr. Green's dismissal did not contain an affirmative expression of opinion by the editor that Selberg's death was not related in any way to his confinement. Such an expression of opinion would probably have been the only effective way to negate the implication of responsibility which would naturally be drawn from the fact of Dr. Green's dismissal. However, the editor did not have a duty to believe that Selberg's death was not related to his confinement, nor was he required to say that he held such a belief. It is not heresy to lack faith in an opinion expressed in a medical report.[2] In fact, even Dr. Green in his statement reported on

---

2. Dr. Beirne's view as to the spontaneity of    Selberg's death is, of course, an opinion.

May 9, set forth above, speculated that Selberg's death could have been caused by a blow caused by Selberg's "falling or stumbling and hitting the bunk"—a comment which indicates doubt concerning the conclusion of the autopsy and suggests that leaving Selberg in an unpadded jail cell without restraints played a causative role in his death.

Third, the Daily News series concerning Selberg's death was in keeping with those values designed to be secured under the constitutional guarantees of freedom of speech and of the press. It received commendations from the American Bar Association and the American Trial Lawyers Association. It exposed dramatic shortcomings in the manner the state cared for those who pose a danger to themselves through delirium or insanity. The record does not reflect whether lasting improvements in the care of such persons were made as a result of the series, but obviously pressures for reform were generated by it.

Today's decision may cause Alaska newspapers to repress information and opinions on matters of public concern because of the fear of a libel suit. On a national level, the Supreme Court of the United States in *New York Times Co. v. Sullivan*, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964) was concerned about this risk,[3] and formulated a rule designed to guard against it. As applied by the majority in the present case, however, the protection afforded by the *Times* rule is so weak as to be illusory.

---

3. [W]ould-be critics of official conduct may be deterred from voicing their criticism, even though it is believed to be true and even though it is in fact true, because of doubt whether it can be proved in court or fear of the expense of having to do so. They tend to make only statements which "steer far wider of the unlawful zone."
*New York Times Co. v. Sullivan*, 376 U.S. at 279, 84 S.Ct. at 725, 11 L.Ed.2d at 706.