**John DOE, on behalf of himself and approximately 62 other persons similarly situated, Petitioner,**

**v.**

**ALASKA SUPERIOR COURT, THIRD JUDICIAL DISTRICT; State of Alaska; State of Alaska Department of Law; Carolyn V. Brown; Laurance A. Marshburn; William Moffatt a/k/a Bill Moffatt; Sherralee Howe and Alaska Right-To-Life, Inc., an Alaskan Corporation, Respondents.**

No. S–859.

Supreme Court of Alaska.

June 20, 1986.

---

Kenneth P. Jacobus, Hughes, Thorsness, Gantz, Powell & Brundin, Anchorage, for petitioner.

Jonathan B. Rubini, Asst. Atty. Gen., Harold M. Brown, Atty. Gen., Juneau, for respondents Superior Court, State of Alaska, and State of Alaska Dept. of Law.

Edgar Paul Boyko, Boyko, Davis & Dennis, and Elizabeth I. Johnson, Johnson & Holen, Anchorage, for respondents Carolyn V. Brown and Laurance A. Marshburn.

Cheri C. Jacobus, Ross & Gingras, P.C., Anchorage, for respondent William Moffatt.

Brent M. Wadsworth, Anchorage, for respondent Sherralee Howe.

Before RABINOWITZ, C.J., and BURKE, MATTHEWS, COMPTON and MOORE, JJ.

## OPINION

MOORE, Justice.

This case raises important constitutional questions regarding the confidentiality of files maintained by the Governor concerning potential appointees to state office. We are asked to decide whether the trial court properly ordered discovery of the

Governor's complete file concerning a candidate for the State Medical Board. The file included internal staff memoranda and numerous letters to the Governor from citizens regarding the potential appointee. We find no error in requiring disclosure of the letters from citizens. However, we conclude that the doctrine of executive privilege may protect from disclosure the internal memoranda in the Governor's file. We remand this question for the trial court to determine the exact nature of the internal documents.

## I.

In 1981, Dr. Carolyn Brown, a licensed obstetrician, was under consideration for appointment to the State Medical Board. Governor Hammond's staff prepared a letter over the Governor's signature appointing Brown. Although the letter was not mailed, the Governor's press secretary announced Brown's appointment and the lieutenant governor sent Brown a congratulatory letter.

In response, Alaska Right-to-Life, Inc. published an article in its "Alaska Right-to-Life Hot Line" urging readers to contact the Governor to protest Brown's selection. The article described Brown as "an abortionist whose methods were so horrible as to cause a boycott by every nurse employed at Valley Hospital." The Governor received 65 letters and telegrams supporting or opposing Brown's appointment. Approximately fifteen urged her rejection.

The Governor subsequently sent Brown a letter informing her that he had decided to follow his past practice of appointing a person recommended by the State Medical Association. The Association had not recommended Brown. The Governor stated that the erroneous press release went out before he approved Brown's appointment, and that he learned of the mistake when he "suddenly was onslaughted by some object-

ing to your 'appointment' because of your alleged stand on abortion." He apologized to Brown for the "erroneous announcement" of her appointment.

Brown and other doctors identified as "abortion profiteers" in the Right-to-Life newsletter sued Alaska Right-to-Life, Inc. and its officers for defamation of character.[1] Brown claimed that the defendants intimidated the Governor and caused him to withdraw Brown's appointment, resulting in damage to her professional reputation and career.

As part of discovery, Brown sought production of the Governor's appointment file, which included letters from private citizens regarding her appointment. Both the state and the Right-to-Life defendants objected. On February 4, 1984, Superior Court Judge Mark C. Rowland ordered the state to produce the "complete file from the ... Governor's Office of the State of Alaska relating to the appointment of Dr. carolyn [sic] Brown to the State Medical Board for the months of April through August, 1981." This discovery order is challenged in this petition.

The state, in opposing Brown's discovery request, described the contents of the file as follows:

[T]here are approximately 65 discrete communications (letters and telegrams) to Governor Hammond supporting or opposing Dr. Brown's appointment. There are an approximately equal number of responsive letters from Governor Hammond or his staff, internal memoranda, and miscellaneous papers. Of these, only two (2) are from defendants; a third item tersely informed one of the defendants that someone other than plaintiff had been appointed; a fourth item, a brief internal memorandum mentions the last name (misspelled) of one defendant in a single short sentence.

1. The original complaint was filed by doctors Brown, Raymond E. Gills and Laurance Marshburn, for themselves individually and on behalf of others similarly situated. The original defendants were Alaska Right-to-Life, Inc. and officers William Moffatt, Sherralee Howe, Doro-

thy Bennett, Shawn Hawbold, Connie Dale, Pamala Siegfried and Kristine Fardig. Certain parties have been dropped from the case, leaving plaintiffs Brown and Marshburn and defendants Right-to-Life and Moffatt and Howe.

Although the court's order authorized disclosure of all documents in the appointment file, counsel for Brown reached a voluntary agreement with the state Department of Law to permit deletion of names and identifying references in the documents. Under the agreement, Brown reserved the right to argue later that names should be provided for any documents with wording similar to the statements in the Right-to-Life newsletter. The court was not involved in this agreement.[2] The state forwarded copies of the edited documents to all parties in the case.

Brown subsequently requested that the Department of Law disclose the unedited versions of three letters and postcards sent to the Governor and one letter from the Governor in response. The state submitted the requested documents to the trial judge for an *in camera* review. The court ordered release of the four communications without deletion of the names.

Brown did not seek the release of additional names. However, in early 1985 defendant Moffatt requested the Department of Law to disclose the names of *all* the persons who wrote the Governor about Brown's appointment. The state then forwarded unedited copies of all the communications to the trial court for an *in camera* review. The state also sent letters notifying the correspondents of the pending release of their identities.

On behalf of himself and sixty-two other people similarly situated, John Doe filed an Original Application for Relief with this court, pursuant to Alaska Appellate Rule 404(a). Doe, who is one of the people who wrote the Governor about Brown's appointment,[3] requested that his right to privacy be protected and that his letter and the letters of the other people remain confiden-

tial. We treated Doe's application as a Petition for Review pursuant to Appellate Rule 402. Because of the important constitutional questions involved, we granted the petition and stayed further release of the names and correspondence of citizens who wrote Governor Hammond in 1981 about Brown's appointment.[4]

## II.

The issue is whether a trial court may order production of the Governor's appointment file containing, *inter alia*, internal staff memoranda and letters from concerned citizens. Petitioner Doe, the state, and the Right-to-Life defendants contend that none of the file documents should have been ordered disclosed.

The parties argue that the trial court discovery order (1) requires production of material not relevant to Brown's libel action, and that it violates (2) the State Personnel Act, (3) the doctrine of executive privilege, and (4) the Alaska Constitution's protection of privacy, free speech, and the right to petition the government.

## A. THE RELEVANCY STANDARD OF CIVIL RULE 26

■ Alaska Civil Rule 26(b)(1) permits a party to discover all evidence, not privileged, that would be relevant at trial or that "appears reasonably calculated to lead to the discovery of admissible evidence." Alaska's civil discovery rules are to be construed liberally, *Van Alen v. Anchorage Ski Club, Inc.*, 536 P.2d 784, 787 (Alaska 1975), and the determination of relevancy is within the trial court's discretion. Because Rule 26(b)(1) recognizes that relevancy at trial and relevancy for purposes of discovery are two different matters, we will reverse a grant of discovery that is at-

---

**2.** We find no merit in Brown's assertion that the trial court discovery order was "impliedly modified by the state and plaintiffs with the cooperation of Judge Rowland" so that it no longer compelled production of the Governor's complete file. The state disputes this claim, and there is nothing signed by the court to indicate either a modification or rescission of the order.

**3.** According to an affidavit filed by Doe's counsel, John Doe is a pseudonym for an adult resident of the Third Judicial District who wrote a letter to Governor Hammond in 1981 regarding Brown's appointment.

**4.** Trial of Brown's libel action was taken off the superior court calendar at the request of the parties.

tacked on relevancy grounds only if the information sought could not reasonably be expected to lead to the discovery of admissible evidence.

The trial judge in Brown's libel action ruled that one of the statements about Brown in the Right-to-Life newsletter was defamatory *per se.* Issues remaining for trial include whether the statement was published with "actual malice," *see Pearson v. Fairbanks Publishing Co.,* 413 P.2d 711, 714 (Alaska 1966), and proof of damages. On the latter issue, Brown asserts that harm to her reputation and the loss of her "appointment" to the State Medical Board are elements of damage which a jury should consider.

Brown contends that discovery of the Governor's appointment file is necessary to help establish "a nexus of causation between the defamation by Right-to-Life and the subsequent withdrawal by Governor Hammond of her appointment." In a nutshell, she seeks to show that the Right-to-Life newsletter prompted people to write to the Governor opposing her appointment, which in turn harmed her reputation and influenced the decision not to appoint her. The fact that at least two of the letters used virtually the same language included in the newsletter supports her claim that the communications were prompted by the newsletter's exhortation that people contact the Governor.[5]

In view of Brown's need to prove damages, we conclude that the trial court correctly determined that the relevancy standard of Civil Rule 26 had been satisfied.

This does not end our inquiry, however. Disclosure of even relevant material *may* not be proper if it intrudes into constitutionally protected areas. A more stringent test is applicable. Furthermore, the relevancy standard of Civil Rule 26 is not con-

trolling if discovery is expressly prohibited by statute.

## B. THE STATE PERSONNEL ACT

■ Alaska's public records statute, AS 09.25.110–.120, requires, as a general rule, that all records and other writings held by a state agency be available for public inspection. Alaska Statute 09.25.110 provides, in part:

Unless specifically provided otherwise the books, records, papers, files, accounts, writings, and transactions of all agencies and departments are public records and are open to inspection by the public under reasonable rules during regular office hours.

Regulations adopted by the Governor's office to implement the public records statute specifically define "record" to include "any existing document, paper, memorandum, book, *letter* ... developed or received under law or in connection with the transaction of official business by an agency." 6 AAC 95.900(4) (effective Oct. 8, 1982) (emphasis added). The parties do not dispute that letters sent by citizens to the Governor regarding appointments are public records within the scope of the public records statute.

Alaska Statute 09.25.120 sets out four exceptions to the general policy of disclosure. Only the fourth exception is relevant here:

Every person has a right to inspect a public writing or record in the state, including public writings and records in recorders' offices except ... (4) records required to be kept confidential by a federal law or regulation or by state law.

AS 09.25.120.

Petitioner Doe and the state argue that letters sent to the Governor regarding appointments are exempt from disclosure because AS 39.25.080(a) of the State Person-

---

**5.** We note that, in alleging damages, Brown does not claim to have a *right* to a state appointment. The state asserts that even if the appointment decision is relevant to Brown's suit, a claim respecting the Governor's exercise of his appointment prerogatives is not justiciable. This argument misses the point. Brown does

not seek to adjudicate the Governor's power to appoint or not appoint a certain person, or whether his decision was properly motivated. She merely seeks to establish that letters allegedly written in response to a defamatory publication influenced his decision.

nel Act provides: "State personnel records, including employment applications and examination materials, are confidential and are not open to public inspection except as provided in this section."

■ This argument is meritless. Even if a letter to the Governor about a potential appointee could be considered a "state personnel record," a doubtful proposition, we conclude that AS 39.25.080(a) does not apply to the personnel records of members of state boards and commissions. Alaska Statute 39.25.110 specifies that members of boards and commissions, as well as certain state employees and elected officials, are in the exempt service and thus are exempt from provisions of the State Personnel Act. Therefore, the requirement in AS 39.25.080(a) that personnel records remain confidential does not apply to State Medical Board members.

The state, however, urges a contrary construction. The state argues that because the statute requiring confidentiality of state personnel records, AS 39.25.080,[6] includes in subsection (b)(4) a *reference* to exempt positions, the statute therefore was intended to apply to both non-exempt and exempt employees. This interpretation is strained. The reference on which the state relies simply requires that information "whether a state employee is in the classified, partially exempt, or exempt service" must be released to the public. AS 39.25.080(b)(4). We are not persuaded that this reference, by implication, overrides AS 39.25.110's specific exemption for board and commission members.

Because we conclude that AS 39.25.080 does not apply to board and commission members, we hold that the letters regarding Brown's appointment fall within the disclosure requirements of the public records statute.

This interpretation of AS 39.25.080 is consistent with the policy that exceptions to the disclosure requirements of the public records statute are to be construed narrowly. In *City of Kenai v. Kenai Peninsula Newspapers*, 642 P.2d 1316 (Alaska 1982), we recognized that "the legislature has expressed a bias in favor of public disclosure" and concluded that "[d]oubtful cases should be resolved by permitting public inspection." *Id.* at 1323. As we noted in *Kenai*, "There is a strong public interest in disclosure of the affairs of government generally, and in an open selection process for high public officials in particular." *Id.* Here, disclosure of the letters at issue furthers the public interest by encouraging public awareness of potential appointees as well as public scrutiny of the selection process, including the extent of lobbying pressure.

We now turn to the question whether the court-ordered disclosure was prohibited by various provisions of the Alaska Constitution.

## C. THE EXECUTIVE PRIVILEGE DOCTRINE

The state asserts that the doctrine of executive privilege bars discovery of both the letters and the internal memoranda in the Governor's appointment file. This doctrine, which has its basis in the constitutional separation of powers principle, recognizes that a chief executive has a qualified power to keep confidential certain internal governmental communications so as to protect the deliberative and mental processes

---

**6.** AS 39.25.080 provides, in part:

    (a) State personnel records, including employment applications and examination materials, are confidential and are not open to public inspection except as provided in this section.

    (b) The following information is available for public inspection, subject to reasonable regulations on the time and manner of inspection:

    (1) the names and position titles of all state employees;
    (2) the position held by a state employee;
    (3) prior positions held by a state employee;
    (4) whether a state employee is in the classified, partially exempt, or exempt service;
    (5) the dates of appointment and separation of a state employee; and
    (6) the compensation authorized for a state employee.

of decision-makers.[7] While we have not had occasion to address the executive privilege doctrine in the context of Alaska's Constitution, the doctrine has been widely recognized by both federal and state courts based on their respective constitutions. *See, e.g., United States v. Nixon,* 418 U.S. 683, 705–10, 94 S.Ct. 3090, 3106–09, 41 L.Ed.2d 1039, 1062–65 (1974); *Hamilton v. Verdow,* 287 Md. 544, 414 A.2d 914, 921–24 (1980).

In *United States v. Nixon,* the Supreme Court held that the privilege is "inextricably rooted in the separation of powers under the [federal] Constitution" and is intended to protect the government's legitimate interest in confidentiality of communications between high government officials. 418 U.S. at 708, 94 S.Ct. at 3107–08, 41 L.Ed.2d at 1064. The Court emphasized the need to protect

> the public interest in candid, objective, and even blunt or harsh opinions in Presidential decision making. A President and those who assist him must be free to explore alternatives ... and to do so in a way many would be unwilling to express except privately.

*Id.* The Court, however, rejected the President's claim that his presidential communications (taped conversations with aides) were absolutely protected from disclosure. The privilege of confidentiality of presidential communications is only a qualified one. *Id.* at 706–07, 94 S.Ct. at 3106–07, 41 L.Ed.2d at 1063. In each case a court must balance the government's interest in confidentiality against the need for disclosure to insure the effective functioning of the judicial system.[8] *Id.* at 707, 94 S.Ct. at 3107, 41 L.Ed.2d at 1063; *Nixon v. Administrator of General Services,* 433 U.S. 425, 447,

97 S.Ct. 2777, 2782, 53 L.Ed.2d 867, 893–94 (1977).

Although we have recognized that the principle of separation of powers is implicit in the Alaska Constitution, *Bradner v. Hammond,* 553 P.2d 1, 5 n. 7 (Alaska 1976), we have never addressed an executive privilege claim. However, other state courts have held that a governor, in the discharge of official duties, is entitled to an executive privilege analogous to the President's. *See, e.g., Hamilton v. Verdow,* 414 A.2d at 921–24; *Nero v. Hyland,* 76 N.J. 213, 386 A.2d 846, 853 (1978); *cf. State, ex rel. Attorney General v. First Judicial District Court,* 96 N.M. 254, 629 P.2d 330, 334 (1981) (holding that state attorney general, as member of executive department, may assert claim of executive privilege). We agree with this view and conclude that the public policy rationale upon which the Supreme Court relied in *United States v. Nixon* is equally applicable to our state government. *Accord Nero v. Hyland,* 386 A.2d at 853.

Although *United States v. Nixon* involved a claim of executive privilege in the context of criminal litigation, numerous lower courts have recognized that claims may be asserted in civil suits.[9] The cases consistently hold that the privilege is only a qualified one, is applicable to internal advice, opinions and recommendations, and is intended to protect the deliberative and mental processes of decision-makers. *See, e.g., Hamilton v. Verdow,* 414 A.2d at 923–25.

In the case before us, the state argues that unless gubernatorial appointment files are privileged from disclosure, the Governor's access to candid, uninhibited advice about potential appointees will be restricted. The state asserts that the trial court's

---

**7.** For a discussion of the development of the executive privilege doctrine, see *Hamilton v. Verdow,* 287 Md. 544, 414 A.2d 914, 920–27 (1980). *See also* Cox, *Executive Privilege,* 122 U.Pa.L.Rev. 1383 (1974).

**8.** The applicability and extent of a claim of executive privilege is a justiciable issue. *United States v. Nixon* recognized that courts have a duty to determine whether communications are

protected by a claim of executive privilege. 418 U.S. at 705, 94 S.Ct. at 3106, 41 L.Ed.2d at 1062.

**9.** *See, e.g., Committee for Nuclear Responsibility, Inc. v. Seaborg,* 463 F.2d 788 (D.C.Cir.1971); *Kaiser Aluminum & Chemical Corp. v. United States,* 157 F.Supp. 939, 141 Ct.Cl. 38 (1958). *See generally* Cox, *supra* note 7, at 1416.

discovery order "materially impairs the Governor's exercise of his constitutional appointment responsibilities."

In analyzing this claim, a key distinction must be made. The Governor's file on Brown contained, on the one hand, unsolicited letters from members of the public and letters of response from the Governor. It also included *internal* communications (memoranda and miscellaneous papers) between government officials. With respect to such internal communications, we find the claim of privilege justified by public policy considerations. As discussed below, there is substantial case law recognizing such a claim. However, we find little support for extending the privilege to unsolicited letters from members of the public.

Courts that have recognized claims of executive privilege focus on the need to protect inter- and intra-agency communications. The rationale underlying the privilege was summed up by one commentator:

> [T]here are two reasons for preserving the confidentiality of intragovernmental documents reflecting advisory opinions, recommendations and deliberations comprising parts of the process by which governmental decisions and policies are formulated: (1) to encourage *aides and colleagues* to give completely candid advice by reducing the risk that they will be subject to public disclosure, criticism and reprisals; (2) to give *the President or other officer* the freedom "to think out loud," which enables him to test ideas and debate policy and personalities uninhibited by the danger that his tentative but rejected thoughts will become subjects of public discussion.[10]

Although most cases in which executive privilege claims have been upheld deal with purely *internal* communications, some involve investigative reports that incorporate non-governmental information collected at the request of a government official. For example, in *Hamilton v. Verdow*, 287 Md. 544, 414 A.2d 914 (1980), a negligence action was filed against officials of a state mental hospital after a patient who was released murdered two youths. The plaintiff sought to discover a confidential investigative report, which concerned the hospital's handling of the patient, prepared for the Governor by an attorney on his staff. *Id.*, 414 A.2d at 917. The Governor asserted a claim of executive privilege. He argued that the entire report was protected from discovery because it contained opinions and recommendations and was prepared solely to help him decide if executive action was necessary. *Id.* at 921.

The court rejected the Governor's claim and held that an *in camera* inspection by the trial court would be appropriate. The court said that to the extent the report contained "opinions, recommendations, and deliberations" of the Governor's attorney, such information would be privileged. *Id.* at 927. In contrast, the court suggested that other non-deliberative material in the report would fall outside the scope of the privilege. *Id.* at 927–28. The court emphasized the need to protect "[a]dvisory communications, *from a subordinate to a governmental officer,*" and "deliberative communications *between officials and those who assist them* in formulating ... governmental action." *Id.* at 922 (emphasis added).

A similar question arose in *State, ex rel. Attorney General v. First Judicial District Court of New Mexico*, 96 N.M. 254, 629 P.2d 330 (1981), where the state sought to prevent discovery of information the attorney general obtained during an investigation of a prison riot. The attorney gen-

---

**10.** Cox, *supra* note 7 at 1410 (emphasis added, footnote omitted). The need to protect the decision-making process of federal agencies was recognized by Congress when it enacted the Freedom of Information Act, 5 U.S.C. § 552 (1982). The act exempts from mandatory disclosure "inter-agency or intra-agency memorandums or letters which would not be available by law to a party other than an agency in litigation with the agency." 5 U.S.C. § 552(b)(5). The privilege is not absolute. An agency must establish that a document is (1) "pre-decisional" and (2) that it is "'deliberative' in nature, reflecting the 'give-and-take' of the deliberative process and containing opinions, recommendations, or advice about agency policies." *Paisley v. C.I.A.*, 712 F.2d 686, 698 (D.C.Cir.1983), *vacated in part on other grounds*, 724 F.2d 201 (D.C.Cir.1984).

eral asserted a claim of executive privilege regarding the investigative materials, which included statements and questionnaires completed by prison guards and inmates. *Id.*, 629 P.2d at 332–33. Some of the persons interviewed had been promised confidentiality. The court held that the statements obtained from corrections officers and other executive department personnel were protected by the executive privilege. *Id.* at 334. However, the court ruled that the privilege "does not protect communications, whether intended as confidential or not, between the executive department and members of the public or others not employed in the executive department." *Id.*

In asserting executive privilege here, the state relies mainly on *Nero v. Hyland*, 76 N.J. 213, 386 A.2d 846 (N.J.1978). In *Nero*, a rejected candidate for a state appointment sought access to a character investigation report prepared by police at the request of the Governor. The court concluded that the government's interest in confidentiality, as recognized by the executive privilege doctrine, outweighed the plaintiff's need for disclosure. *Id.*, 386 A.2d at 853.

The *Nero* court expressed concern that persons questioned as part of a background check would not "be forthright in responding if their anonymity could not be guaranteed." *Id.* at 852. This chilling effect has been recognized by other courts in cases dealing with academic promotions and the use of internal confidential evaluations by co-faculty members. *See, e.g.,* *Keyes v. Lenoir Rhyne College*, 552 F.2d 579 (4th Cir.) (faculty evaluations not subject to civil discovery), *cert. denied,* 434 U.S. 904, 98 S.Ct. 300, 54 L.Ed.2d 190 (1977); *Hafermehl v. University of Washington*, 29 Wash.App. 366, 628 P.2d 846, 848 (1981) (letters from co-faculty not discoverable by professor denied promotion).

However, a distinction should be noted. In cases such as *Nero, Keyes* and *Hafermehl* the requested disclosure involved either *internal* communications stating the opinions and recommendations of state employees, or information directly *solicited* by government officials. In such cases the rationale underlying the executive privilege doctrine—the need to encourage candid opinions and debate among government officials during the decision-making process—is directly applicable. Furthermore, there often is an express or at least an implied understanding of confidentiality attached to such communications.

In contrast, the citizens' letters at issue here were neither internal communications nor were they solicited by a government official. The letters of response sent by the Governor also do not fall into either category. Consequently, we see little justification for requiring confidentiality. When citizen letter-writers "go public" by writing to a government official concerning a public issue, they lose their expectation of confidentiality, as do the government officials who write in response. We do not believe that disclosure of such letters will, as the state claims here, "materially impair" the Governor's exercise of his appointment responsibilities. Furthermore, we note that the policy embodied in the public records statute of promoting citizen access to government documents argues for limiting the scope of the executive privilege doctrine.

■ For these reasons, we hold that the letters sent to the Governor regarding Brown's appointment, as well as the letters of response, are not protected from disclosure by the executive privilege doctrine.

■ In contrast, we find the state's claim of privilege potentially valid with respect to the internal memoranda and "miscellaneous papers" in the appointment file. We do not know their exact content. However, at least some of the documents clearly are internal communications, and they may contain advisory opinions and recommendations. If so, they would constitute the type of internal deliberative communication the privilege is designed to protect. Because the exact nature of the documents is not clear, we must remand this question for the trial court to follow the procedures set forth below.

It is well established that when a formal, specific claim of executive privilege is asserted, a presumptive privilege attaches. *United States v. Nixon*, 418 U.S. at 708, 94 S.Ct. at 3107–08, 41 L.Ed.2d at 1064; *Nixon v. Sirica*, 487 F.2d 700, 717 (D.C.Cir.1973). However, the claim of privilege must satisfy strict procedural requirements. *See, e.g., Black v. Sheraton Corp. of America*, 564 F.2d 531, 543 (D.C.Cir. 1977). In particular, the government must specifically identify and describe the documents sought to be protected and explain why they fall within the scope of the executive privilege. Since a court usually must rely on an affidavit of the responsible department head for information necessary to determine whether to recognize the privilege, the affidavit should be based on personal examination of the documents by the affiant official. *Id.* The party seeking discovery then must make a sufficient showing that the need for production outweighs the interest in confidentiality. *United State v. Nixon*, 418 U.S. at 713–14, 94 S.Ct. at 3110–11, 41 L.Ed.2d at 1067; *Senate Select Committee on Presidential Campaign Activities v. Nixon*, 498 F.2d 725, 730 (D.C.Cir.1974). Upon such a showing, the trial court should review the documents *in camera* before deciding whether to order production. In the absence of such a showing, a claim of privilege should be honored without requiring an *in camera* inspection. *Senate Select Committee*, 498 F.2d at 730.

In the instant case, when the state asserted a claim of privilege before the trial court, the state indicated that the governor's appointment file included a number of internal memoranda and "miscellaneous papers." The state did not specifically identify the memoranda or papers, or indicate whether the documents contained internal opinions or recommendations. Instead, the state focused on the file as a whole and

asserted a privilege as to the entire contents. Since we had not previously addressed the executive privilege issue, or the procedural requirements necessary to assert a claim, it would be unfair to penalize the state for not satisfying such requirements. Thus, we remand this question so that the state will have an opportunity to describe the precise nature of the internal memoranda and "miscellaneous papers" and explain why they fall within the scope of the executive privilege. Similarly, Brown should be afforded a chance to rebut the state's claim by showing that her need for production of the internal documents outweighs the government's interest in confidentiality. *See United States v. Nixon*, 418 U.S. at 713–14, 94 S.Ct. at 3110–11, 41 L.Ed.2d at 1067.

### D. FREE SPEECH AND THE RIGHT TO PETITION THE GOVERNMENT

Petitioner Doe and the Right-to-Life defendants assert that the free speech and right to petition clauses in the Alaska Constitution, art. I, §§ 5 and 6,[11] require that letters sent by citizens to the Governor remain absolutely confidential. The state urges us to construe the petition clause as affording to individuals an absolute immunity to make defamatory statements in the course of petitioning the government. The parties argue that free speech and the right to petition are impermissibly chilled if a person cannot express views to a government official without fear of public disclosure and liability for defamation.

In suggesting that the petition clause guarantees absolute immunity from defamation suits, the parties ask us to interpret the clause as providing broader protection than its federal counterpart. The United States Supreme Court recently ruled that the petition clause of the first amendment does not provide absolute im-

---

**11.** Article I, section 5 of the Alaska Constitution provides:

    Freedom of Speech. Every person may freely speak, write, and publish on all subjects, being responsible for the abuse of that right.

Article I, section 6 of the Alaska Constitution provides:

    Assembly; Petition. The right of the people peaceably to assemble, and to petition the government shall never be abridged.

munity to a person who makes defamatory statements in a petition to government officials. *McDonald v. Smith,* 472 U.S. ——, 105 S.Ct. 2787, 86 L.Ed.2d 384 (1985).

In *McDonald,* a citizen sent two letters to President Reagan, with copies to a few other officials, criticizing a candidate for appointment as a United States Attorney. After the candidate was rejected he sued the author for libel, claiming the letters falsely accused him of fraud, civil rights violations, breach of professional ethics, and extortion or blackmail. 472 U.S. ——, 105 S.Ct. at 2789, 86 L.Ed.2d at 387. The defendant argued that his communications were absolutely privileged under the petition clause. The Court unanimously rejected this view, holding: "The right to petition is guaranteed; the right to commit libel with impunity is not." 472 U.S. ——, 105 S.Ct. at 2791, 86 L.Ed.2d at 390.

*McDonald* emphasized that a contrary conclusion would elevate the petition clause to special first amendment status by affording greater protection to statements made in a petition to the President than to other speech. 472 U.S. ——, 105 S.Ct. at 2791, 86 L.Ed.2d at 390. First amendment rights have never been recognized as absolute, *Gitlow v. New York,* 268 U.S. 652, 667, 45 S.Ct. 625, 630, 69 L.Ed. 1138, 1146 (1925), and the Supreme Court has held that the speech and press clauses do not provide complete immunity from libel actions. *See New York Times Co. v. Sullivan,* 376 U.S. 254, 293–95, 84 S.Ct. 710, 733–34, 11 L.Ed.2d 686, 716–17 (1964) (Black, J., concurring).

We likewise have declined to interpret the speech and press clauses of Alaska's Constitution as conferring absolute protection from defamation liability. We have afforded defendants only a qualified privilege, which requires a plaintiff to prove that a defamatory statement concerning a matter of public interest was published with "actual malice" in order to recover damages. *See Pearson v. Fairbanks Publishing Co.,* 413 P.2d 711, 713 (Alaska 1966); *Green v. Northern Publishing Co.,* 655 P.2d 736, 744–45 (Alaska 1982) (Compton, J., concurring), *cert. denied,* 463 U.S. 1208, 103 S.Ct. 3539, 77 L.Ed.2d 1389 (1983).

Doe and the state contend that *McDonald* is not controlling because we are free to interpret the petition clause in Alaska's Constitution as more protective than its federal counterpart.[12] *See State v. Glass,* 583 P.2d 872, 876 n. 12 (Alaska 1978), *modified on other grounds in City and Borough of Juneau v. Quinto,* 684 P.2d 127 (Alaska 1984). This is correct. However, the rationale underlying the *McDonald* holding is equally applicable to the Alaska Constitution. As Justice Brennan expressed it:

There is no persuasive reason for according greater or lesser protection to expression on matters of public importance depending on whether the expression consists of speaking to neighbors across the backyard fence, publishing an editorial in the local newspaper, or sending a letter to the President of the United States.

*McDonald,* 472 U.S. ——, 105 S.Ct. at 2794, 86 L.Ed.2d at 393 (Brennan, J., concurring).[13]

A few state courts have held that certain specific types of petitioning activity are absolutely privileged. *See, e.g., City of Long Beach v. Bozek,* 31 Cal.3d 527, 183 Cal.Rptr. 86, 645 P.2d 137 (1982), *vacated mem.,* 459 U.S. 1095, 103 S.Ct. 712, 74

---

**12.** Doe also suggests that *McDonald* is distinguishable because it involved the right to bring a libel action directly against the person who had petitioned the government. Here, Doe and the other letter-writers are not defendants. However, this is not significant. The fact that a plaintiff chooses not to sue the author of a defamatory statement does not increase the author's protection from discovery. Also, *McDonald* is important because the defamation cause of action recognized in the case relies on the ability to demand disclosure of the defamatory communication.

**13.** *See also In re IBP Confidential Business Documents Lit.,* 755 F.2d 1300, 1313 (8th Cir.1985) (extending absolute immunity to communications made in the course of petitioning the government is unwarranted and unwise).

L.Ed.2d 943 (1983), *aff'd,* 33 Cal.3d 727, 190 Cal.Rptr. 918, 661 P.2d 1072 (1983) (filing suit against the government is absolutely privileged form of petitioning and therefore government may not bring malicious prosecution action against unsuccessful plaintiff).[14] However, given the facts of this case and the type of petitioning activity involved, we find the *McDonald* reasoning persuasive.

Nevertheless, petitioner Doe urges us to interpret Alaska's Constitution as affording absolute confidentiality to persons who communicate their views to appointing officials. This is necessary, in petitioner's view, to avoid the potential for citizens to be sued for libel if their letters are held discoverable. This is a valid concern. However, the authors will be protected in most cases by the qualified privilege granted to libel defendants who comment on matters of public interest. In order to overcome this privilege, a plaintiff must show "with convincing clarity" that a de-

famatory falsehood was made with knowledge of its falsity or with reckless disregard for whether it was false. *Green v. Northern Publishing Co.,* 655 P.2d at 741. We have deemed this privilege, along with the absolute defense of truth, to be sufficient to protect free speech. *See Pearson,* 413 P.2d at 712–13.[15]

Furthermore, the Alaska Constitution specifically provides: "Every person may freely speak, write, and publish on all subjects, *being responsible for the abuse of that right.*" Art. I, § 5 (emphasis added). The wording of this clause suggests the drafters intended that persons who cause harm, through speech or publication, should be held civilly liable.[16]

In summary, neither Doe nor the state offers a persuasive reason for providing more protection for petitioning activity than for other types of speech. Thus, we reject the argument that the petition clause in the Alaska Constitution affords absolute protection to the letters involved here.

---

**14.** In another state case, *Webb v. Fury,* 282 S.E.2d 28 (W.Va.1981), the court recognized an absolute privilege for defamatory communications by an environmental group to government agencies regarding alleged law violations by a mining company. The court relied on the so-called Noerr-Pennington doctrine, which originated in Supreme Court cases interpreting the relationship between the petition clause and federal antitrust laws. *See Eastern Railroad Presidents Conference v. Noerr Motor Freight,* 365 U.S. 127, 81 S.Ct. 523, 5 L.Ed.2d 464 (1961); *United Mine Workers v. Pennington,* 381 U.S. 657, 85 S.Ct. 1585, 14 L.Ed.2d 626 (1965). The Noerr-Pennington doctrine is premised on the view that Congress did not intend the antitrust laws to bar concerted exercise of the right to petition. The Court held in *Pennington* that "[j]oint efforts to influence public officials do not violate the antitrust laws even though intended to eliminate competition." 381 U.S. at 670, 85 S.Ct. at 1593, 14 L.Ed.2d at 636. Some cases, such as *Webb,* have extended the doctrine to insulate petitioning activity not only from antitrust liability, but from other types of civil liability, such as defamation actions. However, in *McDonald,* both the district court and the Fourth Circuit expressly refused to extend the doctrine to afford absolute immunity to a citizen who makes defamatory statements in a letter to government officials. 562 F.Supp. 829, 838 (M.D.N.C.1983), *aff'd,* 737 F.2d 427, 429 (4th Cir.1984). In affirming, the Supreme Court did not even mention the defendant's argument that the Noerr-Pennington doctrine should be ap-

plied. 472 U.S. ——, 105 S.Ct. 2794, 86 L.Ed.2d 384 (1985).

**15.** Although *Pearson* involved a media defendant, we stated generally that the qualified privilege is necessary because "in certain situations there is a paramount public interest permitting *persons* to speak or write freely without being restrained by the possibility of a defamation action." *Pearson,* 413 P.2d at 713 (quoting *Fairbanks Publishing Co. v. Francisco,* 390 P.2d 784, 793 (Alaska 1964)) (emphasis added). *Cf. Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.,* 472 U.S. —— – ——, 105 S.Ct. 2939, 2952–54, 86 L.Ed.2d 593, 611–12 (1985) (White, J., concurring) (first amendment gives no more protection to the press in defamation suits than it does to others exercising their freedom of speech).

**16.** *See* 2 Proceedings of the Alaska Constitutional Convention 1307 (Jan. 5, 1956). Convention delegate Warren A. Taylor, during discussion of the speech clause, stated:

I was going to call attention to the matter under controversy here regarding speech. We do have the right of free speech, but if you abuse that right by making an obscene statement you can be civilly liable, so the constitution says, 'yes, you can speak on anything you want but you are responsible for the abuse of that right which is given to you' ....

*Id.*

We also reject petitioner's contention that the speech clause requires that such letters remain confidential because of the chilling effect disclosure may have on citizens' exercise of their free speech rights. Both state and federal courts have recognized that the strong public interest in open government and an election process free of taint justifies certain restrictions on free speech. Thus, laws requiring disclosure of campaign contributions, reporting requirements for lobbyists, conflict-of-interest reports by public officials, and open public meetings have been upheld despite the potential to chill speech. *See, e.g., Buckley v. Valeo*, 424 U.S. 1, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976); *cf. Messerli v. State*, 626 P.2d 81 (Alaska 1980).

### E. THE RIGHT TO PRIVACY

■ Lastly, we consider petitioner's argument that the discovery of letters and postcards sent by citizens to the Governor violates the authors' right to privacy guaranteed by article I, section 22 of the Alaska Constitution. Petitioner urges a ruling that "all communications to the public authorities involved in the appointment of candidates for public office are absolutely confidential, and not subject to disclosure" unless the author consents.

■ We decline to so rule. We conclude that the right of privacy is not implicated when an individual voluntarily sends an unsolicited letter to a public official commenting on a public issue such as the appointment of a state officer. In urging a contrary conclusion, petitioner misperceives the nature of the protection afforded by the right of privacy.

Article I, section 22 of the Alaska Constitution provides: "The right of the people to privacy is recognized and shall not be infringed. The legislature shall implement

this section." Although there is no recorded legislative history of this provision, we have addressed the scope of Alaska's right of privacy in several decisions. *See, e.g., Ravin v. State*, 537 P.2d 494, 500–04 (Alaska 1975).[17] A common thread woven into our decisions is that privacy protection extends to the communication of "private matters," *State v. Glass*, 583 P.2d 872, 880 (Alaska 1978), or, phrased differently, "sensitive personal information," *Falcon v. Alaska Public Offices Commission*, 570 P.2d 469, 480 (Alaska 1977), or "a person's more intimate concerns," *Pharr v. Fairbanks North Star Borough*, 638 P.2d 666, 670 (Alaska 1981) (quoting *State v. Oliver*, 636 P.2d 1156, 1167 (Alaska 1981)). This is the type of personal information which, if disclosed even to a friend, could cause embarrassment or anxiety. *Falcon*, 570 P.2d at 479. We have also recognized that article I, section 22 affords special protection to the privacy of the home. *See Ravin v. State*, 537 P.2d at 503–04.

In short, our decisions have held that the right of privacy embodied in the Alaska Constitution is implicated by the disclosure of *personal* information about oneself. The instant situation is distinguishable. A letter sent voluntarily to a public official stating one's opinion on an issue of public importance does not involve the type of "sensitive personal information" protected by article I, section 22. A citizen has a fundamental right to freely communicate his or her views to a public official concerning a public issue. However, we do not believe that Alaska's privacy amendment was intended to guarantee the confidentiality of such communications or permit citizens to escape responsibility for comments so expressed.[18]

In *Ravin v. State*, we recognized that where information adversely affects anoth-

17. For a discussion of decisions interpreting the Alaska privacy amendment, see Note, *Alaska's Right to Privacy Ten Years After Ravin v. State: Developing a Jurisprudence of Privacy*, 2 Alaska L.Rev. 159 (1985).

18. We note that the legislature, which is expressly authorized to implement the privacy provi-

sion, could choose to amend the public records statute, AS 09.25.110–.120, to prevent the disclosure of unsolicited letters to public officials. Absent such action, however, we do not infer any intent to encompass such letters within the protection provided by article I, section 22.

er person, an otherwise legitimate privacy interest may go unprotected:

> No one has an absolute right to do things in the privacy of his own home which will affect himself or others adversely. Indeed, one aspect of a private matter is that it *is* private, that is, that it does not adversely affect persons beyond the actor, and hence is none of their business. When a matter does affect the public, directly or indirectly, it loses its wholly private character, and can be made to yield when an appropriate public need is demonstrated.

537 P.2d at 504 (emphasis in original). Here, the letters regarding Brown's potential appointment to an important state post were intended to influence the Governor's decision and obviously affected the public interest. Thus, the letters lost whatever private character they originally had.

In summary, the letters at issue in this case are not the type of sensitive personal information protected under article I, section 22 of the Alaska Constitution. The trial court correctly rejected the claim that discovery of unsolicited letters from citizens to the Governor commenting on a public issue would invade the authors' right to privacy.[19]

### III.

For the reasons set forth above, we hold that the broad discovery sanctioned in this case was improper in one respect. The internal memoranda in the Governor's appointment file may be the type of internal communications protected from discovery by the executive privilege doctrine. On remand, the trial court should consider the exact nature of the documents before deciding whether to order discovery. Regarding the letters sent by citizens to the Governor, and the letters of response, the required disclosure was proper. Such letters are public documents subject to the disclosure requirements of the public records statute, AS 09.25.110–.120. The constitutional guarantees of free speech,

privacy and the right to petition do not shelter such communications from discovery, nor do they fall within the scope of the executive privilege doctrine.

The superior court order is VACATED in part and REMANDED.

---

**19.** We do not decide whether a letter directly solicited by a public official, accompanied by an implied or express promise of confidentiality, would be protected from disclosure.