**Dan SISEMORE, Plaintiff,**

v.

**U.S. NEWS & WORLD REPORT, INC., William G. Dunn, John S. Lang, and Joanne Davidson, Defendants.**

No. A84–446 Civ.

United States District Court, D. Alaska.

June 25, 1987.

Richard H. Friedman, Sitka, Alaska, Roger A. McShea, Anchorage, Alaska, for plaintiff.

Daniel Westerburg, Birch, Horton, Bittner, Pestinger & Anderson, Anchorage, Alaska, for defendants.

## DECISION—SUMMARY JUDGMENT MOTION

KLEINFELD, District Judge.

This is a diversity case against a national magazine, its publisher, a senior editor, and a bureau chief. The complaint alleges defamation and other torts. Defendants move for summary judgment.

This decision denies the motion in part and grants it in part. This is a close and difficult case, turning on its particular facts. Important First Amendment rights to speak freely, even if falsely, are implicated by a decision to let a defamation case such as this go to trial. Important individual rights to reputation undestroyed by falsehood are implicated by summary judgment. In this case, the critical decision of whether Sisemore was defamed will have to be made by a jury.

The article at issue appeared in the March 12, 1984 issue of U.S. News & World Report (ex. A to defendant's motion). The contents page entitled the article "Vietnam's Sad Legacy: Vets Living in the Wild," and subtitled it "Alaskan wilderness offers haven for many troubled ex-GI's."

The article is featured in "A Memo to Our Readers" on page 4. Defendant Bill Dunn, Publisher, wrote that defendant Joanne Davidson, San Francisco Bureau Chief, "waded through snowdrifts ... to interview some of the hundreds of Vietnam veterans who have scattered through the

wilderness, unwilling or unable to cope with civilization." Ms. Davidson's interview with Dan Sisemore is featured in a description of her trip "to visit veterans who have fled to remote areas."

A photograph of plaintiff Sisemore adorns the upper right corner of the first page of the article. The caption says he "chose the solitude of Alaska because 'my biggest fear was that I was going to hurt someone.'"

The second paragraph of text characterizes the veterans on the Kenai Peninsula in Alaska as persons who are "hiding out" and who "cannot live with their countrymen."

The fifth paragraph quotes Sisemore describing a bizarre episode:

> Dan Sizemore [sic], a Navy veteran who says he "freaked out in the middle of Main Street" in Eureka, Calif., and ran screaming into four lanes of traffic, came here because "my biggest fear was that I was going to hurt someone."

After paragraphs about Sisemore and two other veterans, the article explains that they suffer from a mental disorder:

> What sent such people as these to society's outermost edge is one of the saddest legacies of Vietnam—post-traumatic stress disorder (PTSD)—which some psychologists believe afflicts about 50 percent of all combat veterans. Experts liken the effects of PTSD to emotional troubles experienced by survivors of kidnapping and Nazi death camps.

The article discusses such mentally disordered veterans and "bush vets" for several paragraphs, then comes back to Sisemore:

> Says Sisemore: "I went to the vet center because I needed to yell at someone ..."

The next paragraph, not using Sisemore's name, begins:

> Public attention has focused recently on such loners through tales about barely clad "tripwire vets" who reportedly survive in the wilds using skills they learned in Vietnam.

A Veterans Administration official is quoted as distinguishing such "tripwire veterans" from the Kenai Peninsula veterans, on the ground that "you'd die if you went naked in our cold weather."

The article then discusses other Vietnam veterans in other locations who have committed various crimes, such as "mauling an Asian woman with a pair of pliers," committing armed robbery, going on a rampage with a kitchen knife in a quiet neighborhood killing two men and critically wounding a third, and raping and stabbing two women more than 100 times. The article says few veterans with PTSD have trouble with the law, and most with this disorder "typically are so withdrawn that they punish only themselves."

The parties agree that Alaska law controls, except insofar as it may be affected by federal constitutional law.

■ U.S. News first argues that the article is not defamatory. This court must determine whether Sisemore has established a genuine issue of material fact as to whether a jury could find that the U.S. News article "tends to harm the reputation" of Sisemore "so as to lower him in the estimation of the community or to deter third persons from associating or dealing with him." *Green v. Northern Publishing Co., Inc.,* 655 P.2d 736, 739 (Alaska 1982), cert. denied 463 U.S. 1208, 103 S.Ct. 3539, 77 L.Ed.2d 1389 (1983). Under the *Green* test, a jury could find that the article is defamatory. Reasonable jurors could read the article, in combination with the description on the contents page, to mean that Sisemore suffers from a recognized mental disease which may render him dangerous to himself or others. The distinction U.S. News urges between its allegations regarding the veterans generally and its statements about Sisemore in particular might be rejected by a jury in favor of finding insinuations based upon juxtapositions and combinations of material. *Empire Printing Co. v. Roden,* 17 Alaska 209, 222, 247 F.2d 8, 14 (9th Cir.1957).

■ Second, U.S. News argues for summary judgment on the ground that the article is true. Truth is an absolute defense to libel, and if Sisemore can establish no genuine issue of fact as to the truth of

the defamatory communications, he is not entitled to take the case before a jury. Under *Hepps,* discussed below, the plaintiff in a case such as this one has the burden of establishing falsehood, but the effect on this summary judgment motion is no different.

U.S. News concedes that it used Sisemore's statement, "my biggest fear was that I was going to hurt someone," out of context. The magazine wrote that Sisemore came to Alaska "because" of this fear. It is undisputed that Sisemore was speaking of his running into the highway in California in 1968 when he made this statement, not the reason why he came to Alaska. U.S. News says the difference is not material. A jury might decide, however, that the distinction was material because of its significance to Sisemore's neighbors and co-workers in Alaska. Sisemore's neighbors in Alaska might not care about his conduct many years before as a pedestrian on a California highway, but care a great deal about whether he "was going to hurt someone" among his neighbors on the Kenai Peninsula or his co-workers on the North Slope.

Sisemore adequately demonstrates genuine issues of material fact regarding the truth of several other statements in the article as well. He presents affidavits and other documents, including an affidavit from the senior psychiatrist in the Post Traumatic Stress Disorder Unit of the Palo Alto Veterans Administrations Medical Center, stating that he does not suffer from post-traumatic stress disorder, and his own affidavits stating that he works full-time on the North Slope earning over $60,000 per year, he never set foot in Vietnam and did not serve in combat.

U.S. News argues that its statements amounted to opinion, not actionable as defamation. The magazine correctly argues that "rhetorical hyperbole" and "vigorous epithets" in the context of public debate are constitutionally protected. While Alaska common law rejects the fact-opinion distinction, *Pearson v. Fairbanks Publishing Co.,* 413 P.2d 711 (Alaska 1966), nevertheless as a matter of federal constitutional

law expressions of opinion on matters of public interest are constitutionally protected.

"Statements not themselves factual, and which do not suggest that a conclusion is being drawn from facts not disclosed in the statement, are commonly statements of opinion, not fact." *Koch v. Goldway,* 817 F.2d 507, 509 (9th Cir.1987). In *Koch,* the context was held to have resolved that matter, because the heated debate and the remark were such that "no one would be so credulous" as to believe the remark to state or imply a fact, being more in the nature of a "vicious slur" hurled in "venomous rebuttal" to "brickbats" hurled by the object of the slur. *Id.* at 509–510 The context in the case at bar obviously bears no similarity to that in *Koch.*

■ Factors useful in distinguishing statements of opinion from statements of fact include the facts surrounding publication, a context suggesting that words should be interpreted as hyperbole, and the phrasing as cautious and qualified or as typical reciprocal attack. *Information Control Corp. v. Genesis One Computer Corp.,* 611 F.2d 781 (9th Cir.1980). In the case at bar, these factors are of no help to U.S. News. An ordinary reader would infer that U.S. News had investigated and determined that Sisemore came to Alaska because he was afraid that he was going to hurt someone, that he suffered from PTSD, and that he was one of the twelve persons interviewed who "worked seasonally or not at all." While some characterizations, such as "loner," may be matters of opinion, not all can be so classified. The context of the article suggests careful reporting, not heated argument.

■ The sometimes difficult distinction between statements of fact and opinion is amplified by *Lewis v. Time, Inc.,* 710 F.2d 549 (9th Cir.1983). Heated debate is not necessary to protect opinion from liability. A magazine article may draw inferences treated as non-actionable opinion, provided that it truthfully sets forth the facts from which it draws the inference:

We hold that in a case such as this, where a publication sets forth the facts

underlying its statement of opinion that someone is dishonest, and those facts are true, the Constitution protects that opinion from liability for defamation. Id. at 556.

*Lewis* does not shield U.S. News in the case at bar, because it did not set forth true statements of fact underlying its inferences. The statement of fact as to why Sisemore came to Alaska was incorrect. The statement of fact that "some work seasonally, others not at all" described so small a group as obviously to refer to Sisemore, and was incorrect with reference to him. *Lewis* relies upon the proposition that if nondefamatory facts are stated or presumed, the reader is likely to understand that the opinion is merely an opinion. *Lewis* contrasts that with a situation in which the publisher does risk liability, because the true or nondefamatory facts are not stated. Id. at 555. This case falls within the class which *Lewis* explicitly excepts from the shield for opinion. Sisemore has demonstrated that some critical facts supporting the opinion are not stated, and others are stated falsely.

U.S. News next argues that its statements fell within a privilege for commentary on matters of public interest. Its theory is that defamatory publications on matters of public interest and concern are privileged under Alaska law, unless published with actual malice.

The privilege regarding speech on subjects "of public interest and concern" was set out in *Pearson v. Fairbanks Publishing Co.*, 413 P.2d 711 (Alaska 1966), in the context of a newspaper characterizing columnist Drew Pearson as "the Garbage Man of the Fourth Estate." Pearson lost his libel action against the newspaper at trial and on appeal. The context of the epithet was a disagreement about the relative importance of Mike Stepovich and Ernest Gruening in obtaining statehood for Alaska. The Alaska Supreme Court explained that Pearson was attempting to influence public opinion on this question, and could not complain if a local newspaper disagreed and criticized him for it. The court held as follows:

We believe that a fair balance of these competing interests is achieved where the law of defamation permits one, without liability for damages, to comment, criticize and pass judgment on statements made by another on an issue or matter of public interest, even if such comment, criticism and judgment involves misstatements of fact—so long as such misstatements are relevant to the subject matter spoken or written about by the one claiming to be defamed and are not shown by him to have been made with actual malice. Id. at 713.

The court held that the traditional distinction between fact and opinion was too tenuous to be used as the test, so the privilege applied to non-malicious statements of fact. The court explained its holding as an extension of the privilege to criticize "things which are submitted to the public for approval," id. at 713, enjoyed by book, art and theater critics.

The *Pearson* case does not support U.S. News' position. Sisemore did not write a column on a matter of public interest, as Drew Pearson did, or otherwise submit for public approval some argument on a matter of public interest. He was a passive human interest "peg" for U.S. News' story on a matter of public interest. That is factually distinct from injecting one's own view into public debate on a matter of public interest, and then filing suit against someone else who vituperatively disagrees.

*West v. Northern Publishing Co.*, 487 P.2d 1304 (Alaska 1971) applied *New York Times Co. v. Sullivan*, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964) to a newspaper story alleging that Nome taxicab companies owned by "the liquor interests" regularly furnished liquor to minors. Summary judgment for the publisher was affirmed. The Alaska Supreme Court did not purport to be developing Alaska common law of libel, but to be following *Rosenbloom v. Metromedia, Inc.*, 403 U.S. 29, 91 S.Ct. 1811, 29 L.Ed.2d 296 (1971). *West* says "[u]nder the Supremacy Clause, *Rosenbloom* is controlling, and we therefore hold...." Id. at 1306. The trial judge had applied *Pearson* and *New York Times*, but the Supreme Court, noting that *Rosen-*

*bloom* had come down since the trial judge's decision, explained that it was following *Rosenbloom* and did not discuss or purport to apply *Pearson.* The decision is a short *per curiam* opinion, as is consistent with following controlling authority.

*Gay v. Williams,* 486 F.Supp. 12 (D.Alaska 1979), is a federal district court decision in a diversity case which concludes that even though *"Rosenbloom* was later rejected by the United States Supreme Court in *Gertz "* id. at 15, the Alaska Supreme Court if faced with the question "would retain the actual malice standard adapted by *West."* Id. at 16.

During the eight years since *Gay,* and the sixteen years since *West,* the Alaska Supreme Court has not had occasion to determine whether *West* is still the law of Alaska. *West* follows a then controlling United States Supreme Court decision since repudiated, so its underpinnings have been destroyed. A District Court decision may be persuasive in a subsequent District Court case, but does not control, and considerations of comity are not so strong in an *Erie* context, where the federal court is attempting to determine what state law would be, as they are where the federal court makes determinations of federal law. Considerable development has taken place in defamation law during the eight years since *Gay.* The *Gay* judgment as to the substance of Alaska law may have been correct when made, yet incorrect now. *Gay* therefore cannot be followed blindly.

The Alaska Supreme Court mentioned the "public interest" privilege in *Schneider v. Pay 'n' Save Corp.,* 723 P.2d 619, 623–624 (Alaska 1986), but the mention is dictum at best, since no application of the privilege was before the court.

The "public interest" privilege is mentioned again in *Doe v. Alaska Superior Court,* 721 P.2d 617, 626–628 (Alaska 1986), but again it is dictum. The context there was rejection of an absolute privilege for defamatory communications about a person being considered for appointment to public office. The court said there is no absolute privilege, "only" a qualified privilege. Whether there was a qualified privi-

lege was not at issue. The court refused to interpret the Alaska Constitution as more protective of defamatory speech than the United States Constitution, emphasizing the civil liability implication of the state constitutional language: "Every person may freely speak, write and publish on all subjects, *being responsible for abuse of that right."* Art. I, sec. 5, emphasis in *Doe,* id. at 628.

Sisemore demonstrates that decisions in other states have, when faced squarely with the issue, generally abandoned the "public interest" privilege for defamation of non-public figures. Most jurisdictions followed *Rosenbloom* until *Gertz,* then followed *Gertz.* That is to say, the dominant position in the law now favors a distinction between public and private figures, with the privilege subject to the actual malice exception applicable only to public figures.

Basically in 1971 a plurality of the United States Supreme Court extended the *New York Times v. Sullivan* requirement of "actual malice" to private figures who had the misfortune to be news pegs for stories involving the "public interest." *Rosenbloom v. Metromedia, Inc.,* 403 U.S. 29, 52, 91 S.Ct. 1811, 1824, 29 L.Ed.2d 296, 316–317 (1971). In 1974, the Court repudiated *Rosenbloom,* rejecting the "actual malice" test, but requiring the victim of the defamation to show some actual fault where the public interest was involved, as opposed to the strict liability of common law defamation. The court also limited recovery to compensatory damages, barring presumptive and punitive damages. *Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 345–350, 94 S.Ct. 2997, 3010–3012, 41 L.Ed.2d 789, 807–811 (1974).

In *Philadelphia Newspapers, Inc. v. Hepps,* 475 U.S. 767, 106 S.Ct. 1558, 89 L.Ed.2d 783 (1986), the Supreme Court further developed the *Gertz* branch of the law, making private figure libel even more distinct from public figure libel. Under *Hepps,* a private figure not only must prove fault, but also must prove that that the defamatory statements were false. 89 L.Ed.2d at 792, 106 S.Ct. at 1563. The common law structure, in which truth is an

affirmative defense, is thus rejected in "public concern" cases.

■ Determination of state law in an *Erie* context is difficult in this case. If there were a holding directly in point and independently based on state common law, this court could presume that the state court would apply the principle of stare decisis, but here *West* was explicitly based on and compelled by a since repudiated United States Supreme Court decision. If a holding were logically compelled by other decisions of the state court, consistency in the development of the law could be presumed, but no such compulsion is evident. If there are persuasive grounds for believing that the highest court of a state would no longer adhere to a rule previously announced by it, mechanical application of the rule is inappropriate. 19 Wright & Miller, Federal Practice and Procedure § 4507 at 88–93, and especially at footnote 30.

Any notion of a "trend" in the direction of *West* runs up against the *Green* and *Doe* cases. *Green* has been characterized as aligning Alaska "with the current trend toward the weakening of *New York Times* protection" and as possibly representing "a change in the attitude of the Alaska Supreme Court toward publishers' privilege." *Defining "Reckless Disregard" in Defamation Suits: the Alaska Supreme Court Renders a Narrow Interpretation of the New York Times Rule*, 1 Alaska L.Rev. 297, at 313 and at 317 n. 111; see also last sentence of n. 15 and n. 85 *Doe* expressly rejects an invitation in a related context to interpret the Alaska Constitution more protectively of defamatory speech than the United States Constitution, emphasizing the language in the Alaska Constitution preserving civil liability. *Doe v. Alaska Superior Court*, 721 P.2d at 627–628.

■ In these circumstances, the state should be presumed to follow the rule which is apparently sound and increasingly dominant in other jurisdictions. This rule, consistently with *Gertz*, holds that the actual malice requirement does not apply to comment on matters of public concern which defames persons who are not public figures. Instead, the value of such comment is protected by a requirement of some showing of fault and a limitation on damages. This contrasts with the strict liability of common law defamation. *Hepps* cements in place this rejection of *Rosenbloom*, and adds the requirement that the plaintiff has the burden of proving that the statement was false. Regardless of the applicability of *Gay* in 1979, it is more appropriate now to assume that Alaska law would be in accord with *Gertz* and *Hepps*, not *Rosenbloom*. *West* should no longer be regarded as the law of Alaska, if indeed it was ever state common law as opposed to application of federal constitutional law.

■ Alternatively, if *West* is still the law of Alaska, Sisemore is nevertheless entitled to trial, having raised a genuine issue of material fact as to "malice" under *Green*. Sisemore has established several genuine issues of material fact, discussed above. The issue of "malice," a term of art, resolves itself into whether U.S. News knew of the falsity or recklessly disregarded whether its statements were false.

The U.S. News story grew out of a "story suggestion" memorandum from the San Francisco Bureau Chief of U.S. News:

> When I was in Spokane last week, the local paper carried an article on "trip wire" veterans who are now living in the woods of Washington state. These Vietnam vets, the story said, were responsible for laying land mines during the Vietnam war.
>
> Today they are unable, or unwilling, to cope with post-war stresses and life in general and have taken to the woods to live. They have little or no contact with society, killing wild animals and harvesting plants for food, and fashioning clothes from the skins of the critters they kill.
>
> The article indicated they aren't really dangerous—they just want to be left alone. About a half-dozen were interviewed for the article, and a couple even gave their full names.
>
> I think it would be fascinating to take a closer look at these men—who are

they, what caused them to flee "normal" society, how do they get by, how long do they plan to remain in the woods? Are they mentally ill, do they have families, are they in danger of starving or being killed?

I have the name of the woman who wrote the piece and she's willing to share names, directions, etc., should we be interested in doing a piece of our own. This is a piece I'd LOVE to get into.

Senior editor John Lang in the Washington, D.C. office of the magazine wrote:

Have concluded, reluctantly because it would be juicy if do-able, that we should kill tripwire.

I've talked to vet counseling centers in Pa., S.C., N.C., and W.Va., and nobody knows of any such vets. The VA here in D.C. says nowhere in the federal program is there any information about them, and that the only such reports come from Washington State officials, particularly one consultant for the state who says he's done a study but has not provided any checkable data. I talked with this guy and others he referred me to and they could offer interviews with two semi-tripwire types who have already been interviewed by CBS, Time and People Magazine. The VA here, by the way, advises that Time dropped the story idea after being unable to find any bush vets.

Joanne Davidson [the San Francisco Bureau Chief] is still pursuing some faint leads and the story could be resurrected if she gets lucky. But for now, I surrender.

When the reporter "got lucky," this editor told her "to find three or four 'strong' examples—veterans whose stories could stand alone as 'sidebars' to the main article."

A jury could infer "malice" in the sense this term is used in defamation law from these memoranda, the undisputed evidence that U.S. News knew Sisemore did not come to Alaska because he feared he might hurt someone, the evidence that the magazine knew Sisemore had never set foot in Vietnam, and other evidence. If knowl-

edge of falsity were not established, a jury could infer "reckless disregard" from evidence that the methodology of the news magazine was to write the story first, complete with theme and slant, and then use a reporter to generate colorful descriptions and quotes to differentiate it from the newspaper story upon which the "story idea" was based. A jury could determine that the defendants knew that only two "semi-tripwire types" of veterans had been found after a national search and those two had already been interviewed by CBS, Time and People. The search for the apparently rare "tripwire" type of veteran led to Alaska. Factual inaccuracies to make Sisemore fit the preconceived "tripwire" stereotype in the "story idea" might be deemed by a jury in these circumstances to amount to reckless disregard for the truth.

*Anderson v. Liberty Lobby, Inc.,* 477 U.S. ——, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986), holds that in a public official or public figure case, the trial court should apply the "clear and convincing" standard of proof to the plaintiff's opposition to motion for summary judgment. If *West* is still Alaska law and if it requires application of the clear and convincing standard, Sisemore's evidence nevertheless appears to be sufficient to get his case to a jury. A jury could determine that his evidence, if believed, clearly and convincingly shows reckless disregard for the truth of the defamatory statements about him.

U.S. News also argues that Sisemore consented to be written about, and the magazine was entitled to exercise editorial judgment about what facts to emphasize. Both propositions are correct, but neither is dispositive. Sisemore did not waive his interest in freedom from defamation. The magazine was entitled to choose its interpretation of public events, but not to defame individuals in the course of argument for those interpretations.

U.S. News moves for summary judgment on Sisemore's "false light" claim as well as his defamation claim. In the factual context of this particular case, the issues on "false light" are parallel to and should be resolved consistently with those on def-

amation. Sisemore has established genuine issues of material fact as to whether the tort described in Restatement of Torts 2d § 652E applies. The Alaska Supreme Court has not yet ruled on whether it recognizes this invasion of privacy claim, but it usually follows the Restatement and such claims are commonly recognized elsewhere.

The claims for intentional infliction of emotional distress, outrage and fraud are appropriately the subject of the motion as well. Sisemore has not established a genuine issue of material fact as to any of these claims. Sisemore consents to the dismissal of his fraud claim. The magazine did not inflict mental distress on Sisemore intentionally, and if it was reckless, the recklessness was toward the accuracy of facts, not toward the emotional condition of Sisemore; the fact pattern of this case does not resemble that in intentional infliction of mental distress cases. Sisemore appears not to argue this issue in his opposition to U.S. News' motion. The conduct was not "outrageous" in the sense required by *Richardson v. Fairbanks North Star Borough*, 705 P.2d 454 (Alaska 1985), and *Croft v. Wicker*, 737 P.2d 789 (Alaska 1987).

IT IS ORDERED THAT

1. Defendant's motion for summary judgment is denied as to plaintiff's claims for defamation and false light;

2. Defendant's motion for summary judgment is granted as to plaintiff's claims for intentional infliction of mental distress, fraud, and outrage.

3. The cased management clerk shall set this case on the calendar for a scheduling and status conference, so that dates may be set for jury trial of the remaining issues and for subsidiary matters usual in a scheduling order.